No. 05-361

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 285

VALLEY BANK OF RONAN,

       Plaintiff, Counterdefendant
       and Respondent,

    v.

CHARLES R. HUGHES, Trustee under
Charles R. Hughes Loving Trust,

       Defendant, Counterclaimant
       and Appellant.

APPEAL FROM:    The District Court of the Twentieth Judicial District,
                 In and For the County of Lake, Cause DV 03-28,
                 Honorable C. B. McNeil, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              G. Patrick HagEstad and Elizabeth A. O'Halloran,
              Milodragovich, Dale, Steinbrenner & Binney, P.C., Missoula, Montana

       For Respondent:

              David B. Cotner and Trent N. Baker, Datsopoulos,
              MacDonald & Lind, P.C., Missoula, Montana

                          Submitted on Briefs:  May 3, 2006

                                 Decided:  November 8, 2006

Filed:

                     _____
                               Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Charles R. Hughes (Hughes) appeals the orders entered in the Twentieth Judicial District Court, Lake County, granting summary judgment to Valley Bank of Ronan (Valley Bank) and granting Valley Bank's motion *in limine* to exclude the testimony of Hughes' expert witness. We affirm in part, reverse in part, and remand for further proceedings.

¶2 The following issues are dispositive on appeal:

¶3 Did the District Court err by granting summary judgment against Hughes on his counterclaims?

¶4 Did the District Court err by granting summary judgment to Valley Bank on Hughes' promissory note?

¶5 Did the District Court abuse its discretion by excluding the testimony of Hughes' banking expert, Cynthia Shea?

BACKGROUND

¶6 The District Court's approach to the factual issues in this matter was set forth in its summary judgment order:

> The facts set forth herein are Hughes' "version" of the facts. While several are contested by Valley Bank, the Court has assumed these facts to be true in analyzing the Motion for Summary Judgment presented by Valley Bank.

On appeal, the parties have utilized the same framework. In its appellate briefing, Valley Bank urges us to "likewise . . . test Hughes' facts and determine whether Valley is entitled to judgment as a matter of law." Except for an argument it makes in response to defenses raised by Hughes to foreclosure of the promissory note, wherein it asserts that

2

Hughes has not raised a genuine issue of material fact, Valley Bank urges us to rule that it was entitled to judgment as a matter of law "assuming [Hughes'] facts to be true." Thus, except as otherwise noted, we consider the issues raised herein under that portion of the summary judgment standard of review, *see* ¶ 14, infra, which requires us to determine whether the movant is entitled to judgment as a matter of law.

¶7 Lured by the promise of quick wealth, Hughes was conned by a "Nigerian scam." The swindlers promised Hughes a $3 million to $4.5 million commission for his aid in procuring agricultural equipment for import into Africa and then proceeded to bilk him for hundreds of thousands of dollars in advanced fees. At least some of the funds Hughes advanced were wired via the services of Valley Bank, resulting in a dispute over which party should bear the loss from the flimflam.

¶8 On Friday, March 22, 2002, Hughes received four checks from one of the con-artists and deposited them into accounts Hughes held at Valley Bank. Two of them were "official" checks, and the other two were personal checks. One official check, for $1 million, was drawn on Colonial Bank. The other official check, for $500,000, was drawn on Firstar. The personal checks were for $62,000—drawn on the account of Maximilian H. Miltzlaff—and for $70,000—drawn on a Capital One credit card account held by Sarah Briscoe and Mary Bullard.

¶9 Prior to depositing the checks, Hughes requested that Nancy Smith, a cashier and officer of Valley Bank, verify the validity of the official checks. In his deposition, Hughes described his conversation with Smith:

Well, my question was, how long do you have to hold money to have—how long do you have to hold these checks before they're sufficient funds; I think the bank calls them collected funds. And she said, these are official checks, Chuck. These two big ones are official checks. You will be transferring these? And I said I will be transferring a large sum. We'll have to determine next week what it will be. And she says, official checks, same as cash. You can do whatever you want to do.

Smith also assured Hughes that official checks were "just like" cashier's checks. Milanna Shear, another bank employee, told Hughes to believe whatever Smith said regarding the validity of the checks. According to the deposition testimony of Hughes' wife, Barbara, Hughes had told her that "everybody at the bank assured him that the checks would be good."

¶10    On Tuesday, March 26, 2002, Hughes delivered a written request to Valley Bank to wire $800,000 to Ali dh. Abbas, an accountholder at the Housing Bank for Trade and Finance in Amman, Jordan. Valley Bank executed the transfer no later than 1:51 p.m. on the same day. The transfer proceeded through two intermediary banks, Wells Fargo, near Denver, Colorado, and Citibank in New York, before being sent to Amman. Upon receipt in Amman, the funds were promptly withdrawn, never to be seen again.

¶11    At about 2:00 p.m.—approximately ten minutes after initiation of the transfer— Valley Bank and Hughes learned that one of the personal checks was being returned marked "nonsufficient funds." Hughes immediately requested the wire to be stopped. No later than 3:26 p.m. Valley Bank requested that Wells Fargo reverse the wire transfer. The record is unclear about what happened during the interim between Hughes' request for cancellation and Valley Bank's attempts to comply with the request. The efforts of the several banks involved in the transfer to reverse the transaction were unsuccessful,

4

and the later discovery that the two official checks were counterfeit resulted in Hughes' account being overdrawn by $800,000.

¶12 Valley Bank subsequently exercised its right to charge back the account and collect the $800,000 from Hughes. Allen Buhr (Buhr), Valley Bank's president, met with Hughes on March 29, 2002, to discuss Hughes' liability and suggested at that time that Hughes could be involved in a criminal prosecution for fraud. On April 11, 2002, Hughes deposited $607,838, which he had withdrawn from his retirement account, into the Valley Bank account. Also, on April 30, 2002, Hughes executed a promissory note to Valley Bank on behalf of his trust in the amount of $400,000, secured by mortgaged property. Of the $400,000 in proceeds generated by the secured note, $202,751.21 was used to pay off a previous loan against the mortgaged property, and the balance, $197,248.79, was applied to satisfy the charge-back liability in Hughes' account. Hughes was under the impression, given by Buhr, that the bank needed the note and loan agreement because it expected to be the subject of a government audit in the near future, and though Hughes thought that a new agreement might be reached after resolution of the "fraud situation," he understood that the loan may not be forgiven. The trust subsequently made the first interest payment on the note on August 1, 2002, though it was one month late. The trust made no other payments on the note, and Valley Bank sent a notice of default and acceleration on October 15, 2002. Hughes requested that the bank forebear foreclosure until the end of the year, and the bank complied. However, when Hughes failed to make any more payments on the note, Valley Bank initiated an action for judicial foreclosure. Hughes asserted counterclaims of negligence, negligent

5

misrepresentation, constructive fraud, unjust enrichment, breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and intentional infliction of emotional distress (which was later abandoned).

¶13 On April 15, 2005, the District Court granted Valley Bank's motion *in limine* to exclude Cynthia Shea as an expert witness for Hughes. In an order dated April 20, 2005, the District Court granted Valley Bank summary judgment on Hughes' counterclaims. On the same day, the District Court granted Valley Bank summary judgment on its claims regarding the promissory note. From these orders Hughes appeals.

STANDARD OF REVIEW

¶14 This Court articulated the standard of review we apply to grants of summary judgment in *Grimsrud v. Hagel*, 2005 MT 194, ¶ 14, 328 Mont. 142, ¶ 14, 119 P.3d 47, ¶ 14 (citations and quotation marks omitted):

> This Court's review of a district court's grant of summary judgment is *de novo*. Our evaluation is the same as that of the trial court. We apply the criteria contained in Rule 56, M.R.Civ.P. According to this rule, the moving party must establish both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. If this is accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. If the court determines that no genuine issues of fact exist, the court must then determine whether the moving party is entitled to judgment as a matter of law.

¶15 We review conclusions of law for correctness. *Galassi v. Lincoln County Bd. of Comm'rs*, 2003 MT 319, ¶ 7, 318 Mont. 288, ¶ 7, 80 P.3d 84, ¶ 7.

¶16 This Court described the standard of review for evidentiary rulings in *McDermott v. Carie*, 2005 MT 293, ¶ 10, 329 Mont. 295, ¶ 10, 124 P.3d 168, ¶ 10:

6

We review a district court's evidentiary rulings for an abuse of discretion. *Busta v. Columbus Hosp. Corp.* (1996), 276 Mont. 342, 353, 916 P.2d 122, 128. Absent a showing of such abuse we will not overturn a district court's ruling on the admissibility of evidence. *Christofferson v. City of Great Falls*, 2003 MT 189, ¶ 8, 316 Mont. 469, ¶ 8, 74 P.3d 1021, ¶ 8 (citation omitted). A court abuses its discretion if it acts "arbitrarily without employment of conscientious judgment or exceed[s] the bounds of reason resulting in substantial injustice." *VonLutzow v. Leppek*, 2003 MT 214, ¶ 14, 317 Mont. 109, ¶ 14, 75 P.3d 782, ¶ 14 (citation omitted).

## DISCUSSION

¶17 A short introduction to the check settlement process will give context to our following legal analysis. When a customer deposits a check at a bank, the bank will sometimes (but not always) credit the customer's account immediately with the face amount of the check and permit the customer to draw on the deposited funds. This practice is known in Uniform Commercial Code[1] parlance as "provisional settlement" because the bank has not yet presented the check to the drawee bank and received payment from the check maker's account (which would constitute "final settlement"). The depositary bank, however, may "charge back" the depositor's account in the event the check is subsequently dishonored by the drawee bank. Thus, the UCC encourages the provisional settlement process by protecting a depositary bank from fraudulent or otherwise unenforceable check deposits. With this overview of the check settlement process in mind, we turn now to the specifics of the case before us.

---

[1]Codified at Title 30, Chapters (also called "Articles") 1 through 9A, Montana Code Annotated, and referred to as the "UCC." Citations to UCC provisions that do not include "MCA" are to the UCC as adopted by the National Conference of Commissioners on Uniform State Laws. All other references, except as used in a quotation, to "UCC" refer to the statutory scheme as adopted in Montana.

**¶18 Did the District Court err by granting summary judgment against Hughes on his counterclaims?**

*UCC Preemption and Ordinary Care*

¶19 Hughes argues that the District Court erroneously concluded that the UCC preempts Hughes' equitable and common law claims. Hughes asserts that preemption does not occur because "[t]here *are* no regulations or UCC provisions which expressly regulate . . . promises and representations that bank personnel make to their customers." Further, Hughes contends that the "practical effect of the District Court's interpretation affords banks absolute immunity for negligence, fraud, misrepresentation and other acts which are not expressly addressed in the UCC . . . ."

¶20 The District Court rested its conclusion on its interpretation of § 30-1-103, MCA, which reads as follows:

> Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

The District Court stated that the "official comments to UCC § 1-103 [on which § 30-1-103, MCA, is based] show that preemption of common law and equitable claims is one purpose of the . . . statute . . . ." The official comment to which the District Court referred clarifies that

> while principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise. In the absence of such a provision, the Uniform Commercial Code preempts

8

principles of common law and equity that are inconsistent with either its provisions or its purposes and policies.

The language of subsection (b) is intended to reflect both the concept of supplementation and the concept of preemption.

UCC § 1-103, cmt. 2. The District Court also concluded that three cases from other jurisdictions, *Chase v. Morgan Guarantee Trust Co.*, 590 F.Supp. 1137 (S.D.N.Y. 1984), *Allen v. Carver Federal Sav. and Loan Ass'n*, 477 N.Y.S.2d 537 (N.Y. App. Div. 1984), and *Call v. Ellenville Nat. Bank*, 774 N.Y.S.2d 76 (N.Y. App. Div. 2004), "support preemption of equitable and common law claims under the applicable UCC provisions and facts of this case."[2]

¶21    We disagree with the District Court's interpretation of § 30-1-103, MCA, and of *Chase*, *Allen*, and *Call*. A bank receiving checks from depositors must use "ordinary care"—as that term is defined and used in the UCC—in settling those checks. *See* §§ 30-4-103(3), 30-4-103(5), and 30-4-212, MCA.[3] Section 30-3-102(g), MCA, defines "ordinary care" as follows:

"Ordinary care" in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which that person is located, with respect to the business in which that person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable

[2]The District Court also relied on *Daniels-Sheridan v. Bellanger*, 2001 MT 235, 307 Mont. 22, 36 P.3d 397, in support of its conclusion. However, *Daniels-Sheridan* considered whether equitable principles displaced the UCC's Article 9 priority rules. As our discussion will show, the pivotal issue here is not whether equitable principles displace the applicable portions of the UCC but whether the UCC wholly displaces common law and equitable principles. Thus, reliance on *Daniels-Sheridan* is inapposite.

[3]Section 30-4-104(3), MCA, incorporates the definition of ordinary care in § 30-3-102(g), MCA, into Article 4.

9

> commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this chapter or chapter 4.

In its order, the District Court examined the meaning of "ordinary care" but did not distinguish the term's application to the two different actions at issue here: the settlement of the deposited checks and the alleged representations about the check settlement process. The second sentence of the definition of ordinary care specifically states that, subject to certain exceptions, a bank does not have a duty to examine instruments, in this case, checks. Pursuant to § 30-1-103, MCA, and UCC § 1-103, cmt. 2, such specificity preempts any common law concepts that might otherwise supplement the UCC. Thus, to the extent that Hughes' common law claims relate to Valley Bank's processing of the checks, they are preempted by the UCC.

¶22 Indeed, Hughes presents a claim directed toward the UCC-defined standard of ordinary care with respect to check processing. Hughes asserts that, by failing to comply with its own policies and the applicable federal regulations, Valley Bank inappropriately charged back his account after the dishonor of the deposited checks. However, § 30-4-212(4), MCA, states, "[t]he right to charge back is not affected by . . . failure by any bank to exercise ordinary care with respect to the item but any bank so failing remains liable." Official Comment 5 to § 30-4-212(4), MCA, expounds on this point, stating that "charge-back is permitted *even where nonpayment results from the depositary bank's own negligence.*" (Emphasis added.) Accordingly, in evaluating the propriety of Valley

10

Bank's actions with regard to check processing, it is irrelevant whether Valley Bank exercised ordinary care in exercising its charge back rights, and the claims are preempted.

¶23    However, Hughes' claims encompass not only Valley Bank's processing of the checks but also the bank's communications to Hughes about that process.  Because such communications are not addressed with specificity by the UCC, common law and equitable principles supplement the UCC and govern the legal rights and responsibilities that apply to Valley Bank's representations to Hughes, upon which Hughes allegedly relied.  *See* § 30-1-103, MCA; *First Georgia Bank v. Webster*, 308 S.E.2d 579, 581 (Ga. Ct. App. 1983) (UCC does not provide relief from common law negligence; thus, common law actions are permissible.); *see also* Henry J. Bailey & Richard B. Hagedorn, *Brady on Bank Checks* ¶ 24.05, n.84 (8th ed., 1999).[4]  Thus, the District Court erred by

---

[4]Some courts, in confirming the propriety of asserting common law and equitable principles in similar factual contexts, have concluded that the doctrine of equitable estoppel prevents a bank from exercising its charge-back rights under their states' equivalent of UCC § 4-212.  *First National Bank of Denver v. Ulibarri*, 557 P.2d 1221 (Colo. Ct. App. 1976); *Webster*, 308 S.E.2d 579; *Symonds v. Mercury Sav. and Loan Ass'n*, 275 Cal. Rptr. 871 (Cal. Ct. App. 1990); *Burke v. First Peoples Bank of N.J.*, 412 A.2d 1089 (N.J. Super Ct. 1980).  These cases support our conclusion that common law and equitable principles apply to supplement the UCC in this context, but they run counter to the District Court's conclusion that equitable estoppel is inapplicable, a conclusion for which there is support.  *See* Bailey & Hagedorn, *Brady on Bank Checks* ¶ 24.05, n.84 ("It would seem that a bank should have the right of chargeback notwithstanding its negligence or any act amounting to estoppel, in view of UCC § 4-212(4)(b) (1962), but the right of chargeback should be offset by the loss sustained by the customer because of reliance on the bank's representation and the customer's change of position because of such reliance."); *Hanners v. Industrial State Bank*, 791 P.2d 752 (Kan. Ct. App. 1990) (not designated for publication but citable as persuasive authority pursuant to Kan. Sup. Ct. Rule 7.04(f)(1)) (right to charge back not affected by failure of the bank to exercise ordinary care).  In any event, because the District Court's determination that equitable estoppel is inapplicable is not challenged on appeal, and thus

concluding that the UCC preempted common law and equitable principles with respect to the alleged misrepresentations. Therefore, while Hughes bore the obligation to repay Valley Bank to satisfy the bank's right of charge-back under § 30-4-212, MCA, it nevertheless is possible for Hughes to obtain a judgment to compensate him for the charge-back debt, though we express no opinion on the ultimate merits of these common law claims in this case.[5]

¶24 Although holding in favor the bank in each case, *Chase*, *Allen*, and *Call* do not support preemption with regard to Valley Bank's alleged misrepresentations. Rather, there is support within these decisions for this Court's determination that common law principles apply to bank communications to a depositor inquiring about the processing of checks. In each of these cases, the bank exercised its right of charge-back under UCC § 4-212 and the plaintiff depositor alleged either that the bank had informed him that the deposited check had "cleared" or that the bank had led him to believe that it would clear in a certain amount of time.

¶25 The *Chase* court expressly acknowledged the possibility that common law principles could apply to the type of communications at issue here:

---

waived, we reserve judgment on the issue until it is properly presented to this Court in another case.

[5]Although we would prefer, for guidance on remand, to specifically state which of Hughes' delineated counterclaims survived summary judgment and which did not, we cannot do so, given the manner in which they are pled. For example, the negligence counterclaim alleges a breach of ordinary care by Valley Bank. As discussed above, entry of summary judgment was proper with regard to breach of ordinary care in check processing, but was not proper with regard to breach of ordinary care in the making of the alleged representations about the validity of the checks.

> [B]anks have nothing to gain by misleading customers into believing that uncleared items have cleared. Indeed, banks are usually overly cautious in giving provisional credit precisely because of the uncertainty of uncollected items. A bank could be liable for a misstatement in these general circumstances if the misstatement were part of a scheme to defraud a customer in Chase's position by, for example, a conspiracy between the bank and the party to whom Chase transferred the funds. This of course is merely one example. As discussed supra, however, [UCC] § 4-212(4) simply does not hold liable for charge-back a bank whose employee inadvertently in some remark misleads a customer as to the precise likelihood that an item will clear.
>
> *The outcome might be different if a bank expressly informed a customer that it had made a final settlement on the account*, but that is not the case here.

*Chase*, 590 F.Supp. at 1139 n.3 (emphasis added).

¶26    The court in *Allen* also acknowledged the potential for common law liability in this context:

> We are dubious that the mere statement of a depositor that an unidentified teller told her (mistakenly) that a check had "cleared", when in fact it had not, constitutes that quantum of proof of negligence which will enable a customer to prevail against the bank under the circumstances disclosed here.

*Allen*, 477 N.Y.S.2d at 538. Though the *Allen* court did not distinguish the bank's duties in processing the check at issue from its duties in its communications to its depositor about that process, the language employed in the opinion suggests that some "quantum of proof" would be sufficient "to prevail against the bank" on common law claims in different circumstances.

13

¶27 Similarly, in *Call*, the court indicated that the "term 'cleared' . . . is not the equivalent of 'final settlement'"[6] and that, "although Mr. Call apparently assumed such, *he did not allege that this was a result of any inquiry with or representation to that effect by the defendant bank.*" *Call*, 774 N.Y.S.2d at 79 (emphasis added). Thus, the court, though not squarely addressing the issue, left open the possibility that a bank's misrepresentation of the status of the check settlement process could lead to liability for the bank.

¶28 In each of the above cases, the defendant bank was granted summary judgment because the plaintiff depositor failed to allege facts sufficient to impute liability to the bank. However, though the bank prevailed in each case, the analyses do not support the proposition that common law and equitable principles have been preempted by the UCC. Instead, they intimate that, in certain circumstances, common law and equitable principles may supplement the UCC where the bank—though not violating its UCC-defined duty of ordinary care with respect to processing checks—breaches a duty to its depositor by misrepresenting the status of the check settlement process.

¶29 In summary, the District Court correctly determined that Valley Bank did not violate the UCC-defined duty of ordinary care in processing the checks. However, the District Court erred by failing to consider whether common law and equitable principles

_____

[6]Though it does not affect our analysis here, we pause to express bewilderment at this statement of the *Call* court. If the term "cleared" means anything in common banking usage, it is that final settlement has occurred. *See* Black's Law Dictionary (7th ed., 1999) (defining "clear" as "to pay (a check or draft) out of funds held on behalf of the maker <the bank cleared the employee's check>"); *see also* § 30-4-104(1)(j), MCA (defining "settle"), and *Southside Nat. Bank v. Hepp*, 739 S.W.2d 720, 723 (Mo. 1987) (final settlement occurs when "the payor bank has paid the item.").

supplement the UCC-defined duty of ordinary care with respect to the representations about the check settlement process. Therefore, we reverse the District Court's order and remand for further proceedings on the matter.

*Holder in Due Course*

¶30    Hughes argues that he took the counterfeit checks in good faith and that under the provisions of § 30-4-205, MCA, he became a "holder in due course." He also alleges that by then depositing those checks, Valley Bank became a holder in due course of the checks. According to Hughes, under the UCC's rules regarding holders in due course, Firstar and Colonial then "had no defenses to the 'checks' and were required to pay the sums to Valley." Consequently, Hughes argues, assuming Valley Bank took the deposited checks in good faith, it should have sought to recoup its losses from Firstar and Colonial, not Hughes, which it failed to do. Alternatively, Hughes contends that if Valley Bank knew of the "potential irregularities" with the checks, then Valley Bank "acted outside the bounds of UCC-defined 'good faith' banking standards" and "must be the 'stuckee' of this transaction . . . ."

¶31    Valley Bank correctly points out that this is a new argument on appeal that was not raised in the District Court and that should not be entertained by this Court.

> The general rule in Montana is that this Court will not address either an issue raised for the first time on appeal or a party's change in legal theory. *Day v. Payne* (1996), 280 Mont. 273, 276, 929 P.2d 864, 866 (citation omitted). The basis for the general rule is that "it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." *Day*, 280 Mont. at 276-77, 929 P.2d at 866 (citation omitted).

15

*Unified Industries, Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15.  Therefore, we do not address this issue.

*The Wire Transfer*

¶32    Hughes contends that the District Court erred by ruling that Article 4A of the UCC applies to the $800,000 wire transfer and that Hughes' negligence claims with respect to the transfer cannot proceed to trial.  Both parties agree that the wire transfer was executed via Fedwire and that the Electronic Funds Transfer Act, 15 U.S.C. § 1693 et seq. (2004), does not apply, but Hughes fails to offer authority demonstrating that Article 4A does not apply.  As the District Court correctly concluded, "Federal Reserve Regulation J governs wire transfers via the Fedwire system," and Appendix B to that regulation incorporates UCC Article 4A.  12 C.F.R. § 210.25 et seq.  Further, the District Court rightly held:

> There is no requirement or duty under Regulation J or UCC Article 4A that a bank agree to cancellation under any circumstances.  Here, it is undisputed that the soonest the stop order if any was made, was after Valley Bank executed the payment order.  As such, there is no liability that can be alleged.

Therefore, we conclude that the District Court did not err by granting summary judgment to Valley Bank on Hughes' negligence claims with respect to the wire transfer.

¶33    **Did the District Court err by granting summary judgment to Valley Bank on Hughes' promissory note?**

¶34	Hughes maintains that the promissory note he signed to satisfy his charge-back debt is invalid by reason of illegal purpose, lack of consideration, lack of consent due to menace and undue influence, and unconscionability.[7]

¶35	First, Hughes asserts that the promissory note was invalid because it was made for the illegal purpose of "hiding Valley's unlawful transaction from a government auditor." Valley Bank correctly responds that Hughes failed to raise this affirmative defense in the proceedings below and is therefore barred from raising it here. *See Easley*, ¶ 15.

¶36	Hughes next contends that if he is not liable for the charge-back, then the promissory note fails for lack of consideration because he would have received nothing in exchange for his agreement to pay the note. As discussed in ¶¶ 20-21 above, Hughes' liability for the charge-back and Valley Bank's potential liability for its representations to Hughes are separate issues. Under § 30-4-212, MCA, Hughes became liable for satisfying the entire charge-back debt; thus, the promissory note does not fail for lack of consideration.

¶37	Hughes argues that Buhr "threatened Hughes that he could be charged with fraud" and that this "threat" constitutes menace under § 28-2-403, MCA, and *A.H. Averill Machinery Co. v. Taylor*, 70 Mont. 70, 223 P. 918 (1924). However, *Averill* makes clear that

> [i]f a party, who relies upon menace to relieve him from the consequences
> of his contract, remains silent for an unreasonable time after the removal of
> the menace, he may be held to have elected to waive the wrong and ratify

---

[7]Hughes also mentions actual fraud and constructive fraud in his opening brief, but he fails to develop any argument thereon. Accordingly, we do not address these issues. *See* M. R. App. P. 23(a)(4).

17

the contract; but it is the general rule that to constitute an affirmance the conduct of the injured party must be such as to indicate an intention to condone the wrong and a purpose to abide by its consequences, and the influence of the menace must be removed before the conduct becomes voluntary.

*Averill*, 70 Mont. at 79-80, 223 P. at 921. Regardless of whether Buhr's statement constitutes conduct that could amount to menace within the statutory definition, we conclude that Hughes' first quarterly payment made on August 1, 2002—three months after executing the note—and his subsequent renegotiation of the note sometime after October 15, 2002, comprise a ratification of the contract under *Averill*. Therefore, the note does not fail for lack of consent due to menace.

¶38 Hughes also contends that "Buhr exercised undue influence by utilizing his knowledge of Hughes' assets and took unfair advantage of Hughes' apparent distress over the situation in order to gain a legal advantage over Hughes." Undue influence is defined by statute in § 28-2-407, MCA, but in *Heintz v. Vestal*, 185 Mont. 233, 237, 605 P.2d 606, 608 (1980), we summarized the test: "The influence exerted must be such as to destroy the free agency of the influenced person with the will of another substituted." In addition, we held that a court must take "into consideration the mental and physical health of the party being influenced" and "all of the surrounding circumstances." *Heintz*, 185 Mont. at 237, 605 P.2d at 608. Here, whatever influence Buhr may have exerted over Hughes, it did not rise to the level of substituting his will for that of Hughes. Moreover, there is no indication that Hughes was in a mentally or physically weak state or in a confidential relationship with Buhr. Thus, the note does not fail for lack of consent as a result of undue influence.

18

¶39    Finally, Hughes asserts that the contract is unconscionable, but he fails to cite to any legal authority to support his position, and he does not develop his argument beyond a mere conclusory statement. Therefore, we do not consider it. *See* M. R. App. P. 23(a)(4)

¶40    Accordingly, based upon the claims made and facts asserted herein, we affirm the District Court's grant of summary judgment to Valley Bank on the promissory note.

¶41    **Did the District Court abuse its discretion by excluding the testimony of Hughes' banking expert, Cynthia Shea?**

¶42    The District Court disqualified Cynthia Shea as an expert witness because she lacked adequate knowledge of the UCC standard of ordinary care defined in § 30-3-102(g), MCA. The District Court reasoned that, though Shea is "well qualified by education, special training and experience in banking policies and procedures," the "record here establishes that Shea has no knowledge of the reasonable commercial standards prevailing in the area in which the Plaintiff bank is located in Ronan, Montana."

¶43    Hughes relies on this Court's holding in *Burlingham v. Mintz*, 270 Mont. 277, 891 P.2d 527 (1995), to challenge the District Court's ruling. Hughes argues that banking practices are "so basic that the standard of ordinary care is universal with respect to those duties of a bank."

¶44    In *Burlingham*, we overruled *Negaard v. Estate of Feda*, 152 Mont. 47, 446 P.2d 436 (1968), which required dentists to "exercise such reasonable care and skill as is usually exercised by a dentist in good standing in the community in which he or she

19

resides." *Burlingham*, 270 Mont. at 280, 891 P.2d at 529. We held in *Burlingham* that the standard for non-emergency dental care is the same as that required throughout the United States. *Burlingham*, 270 Mont. at 280, 891 P.2d at 529. This uniform standard stood in contrast to the standard of care for a general practitioner physician in rural communities, who "is held to the standard of a reasonably competent general practitioner acting in the same or similar community or in the same or similar circumstances." *Burlingham*, 270 Mont. at 280, 891 P.2d at 529.

¶45  *Burlingham* set forth a *judicially* defined standard of care applicable to the type of service at issue. That is not the case here. The UCC statutes define a bank's duty of ordinary care with respect to the community in which the bank is situated. Therefore, *Burlingham* is inapplicable, and we reject Hughes' contention that the relevant standard of care is universal. Hughes has neither demonstrated that Shea possesses any knowledge of the reasonable commercial standards prevailing among Montana's banks nor that she has knowledge of procedures that fall within Montana's general banking usage. Accordingly, we conclude that the District Court did not err by excluding Shea's testimony regarding the UCC-defined standard of ordinary care.

¶46  Hughes raises other issues on appeal. However, given our holdings herein, it is unnecessary for us to address those additional issues.

CONCLUSION

¶47  The District Court correctly concluded that Valley Bank did not violate the UCC-defined duty of ordinary care in processing the checks. Thus, it did not err by granting

20

summary judgment to Valley Bank on the promissory note and did not err by excluding Shea's testimony, and we affirm on those issues.

¶48 The District Court erred by failing to consider whether common law and equitable principles supplement the UCC-defined duty of ordinary care with respect to the bank's representations about the check settlement process. Therefore, we reverse the District Court's order with regard to Hughes' counterclaims based upon those representations and remand for further proceedings.

¶49 Affirmed in part, reversed in part, and remanded for further proceedings.


/S/ JIM RICE


We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS