Justice Laurie McKinnon delivered the Opinion of the Court.
**274 ¶1 Christopher Lee Alexander (Alexander) appeals an order from the Fifth Judicial District Court, Jefferson County, granting Montana Developmental Center's (MDC) motion for summary judgment.
¶2 Alexander presents the following issue for review:
**275 Did the District Court err in concluding that no genuine issues of material fact existed as to whether MDC engaged in an interactive process with Alexander or provided him with a reasonable accommodation?
¶3 We affirm.
FACTUAL AND PROCEDURAL BACKGROUND
¶4 Alexander is a former employee of MDC, an intensive, short-term treatment facility for individuals with intellectual disabilities and co-occurring mental illnesses. In 2015, the Montana Legislature passed Senate *93 Bill 411, which required MDC to close in June 2017.[1] 2015 Mont. Laws 2077.
¶5 In 2007, MDC promoted Alexander to shift manager, a position responsible for all aspects of management for one or more residential treatment units at MDC during assigned shifts. Alexander's duties as a shift manager included supervising psychiatric aides, implementing and monitoring client care and programming, and managing living units and classrooms. When necessary, MDC required shift managers like Alexander to physically restrain clients, which sometimes led to physical confrontations. Between 2007 and 2014, Alexander reported fifteen incidents in which he was attacked or injured by a client while on duty. After one such incident, Alexander underwent shoulder surgery. He returned to work in November 2014, but his treating physician, Dr. DiGiovine, restricted him from physical contact with clients. MDC accommodated Alexander's medical restrictions during his recovery.
¶6 In July 2015, Dr. DiGiovine found Alexander's shoulder could not recover further. He informed Alexander and MDC that Alexander's medical restriction against restraining clients was permanent. Derrek Shepherd (Shepherd), the Americans with Disabilities Act Coordinator and the Civil Rights and Equal Employment Opportunity Specialist for the Montana Department of Public Health and Human Services, then discussed possible accommodations with Alexander such as a shoulder brace that would allow him to safely restrain clients again. Alexander spoke with Dr. DiGiovine about it, but Dr. DiGiovine concluded a shoulder brace or other support offered Alexander no significant **276 protection from reinjury.
¶7 In September 2015, Alexander proposed an alternative accommodation to MDC that would allow him to remain as shift manager: Alexander asked MDC to staff at least two direct support professionals with him at all times to ensure he would not need to engage in physical confrontations with clients. Shepherd and Donna Gilmer (Gilmer), MDC's Human Resources Manager, discussed Alexander's proposed accommodation, but they found it unworkable. They expressed concerns that even if they could staff Alexander's unit as he had requested-which they found difficult to achieve because of staffing issues confronting MDC due to its impending closure-the additional direct support professionals could not ensure Alexander would not need to restrain clients. Shepherd therefore informed Alexander that Alexander's solution was unfeasible, but he also told Alexander to let him know if there were other accommodations that would allow Alexander to restrain clients.
¶8 Both Shepherd and Gilmer then began discussing alternative positions with Alexander that he could be reassigned to. Shepherd offered to research and identify vacant positions Alexander qualified for once Alexander informed Shepherd of his qualifications, education, and training. Shepherd also advised Alexander to check positions that MDC posted internally through weekly bulletins and publicly through the State of Montana website. Gilmer identified specific vacant positions for Alexander, including a maintenance position and a data control technician position. Alexander expressed to Gilmer he was unqualified for the data control technician position, and he did not follow up with Gilmer or Shepherd regarding other available vacant positions. Likewise, Alexander did not inform Shepherd of his qualifications, education, and training. Alexander did not propose any additional accommodations that would allow him to continue his employment as a shift supervisor. Because MDC and Alexander could not identify an accommodation that would allow Alexander to safely restrain clients-an essential function of the shift supervisor position-and because Alexander did not work with MDC further to identify a vacant position he was qualified to fill, MDC terminated his employment in November 2015.
¶9 After exhausting his administrative remedies, Alexander filed a lawsuit against MDC in the District Court claiming MDC discriminated against him due to his physical disability in violation of the Montana Human *94 Rights Act (MHRA). Both parties moved for summary judgment. The District Court ruled in favor of MDC and dismissed Alexander's claim, holding that no genuine issues of **277 material fact existed as to whether MDC engaged in an interactive process with Alexander or provided him with a reasonable accommodation and that MDC was entitled to judgment as a matter of law.
STANDARD OF REVIEW
¶10 "We review a district court's grant or denial of summary judgment de novo, applying the criteria of M. R. Civ. P. 56." Borges v. Missoula Cty. Sheriff's Office , 2018 MT 14, ¶ 16, 390 Mont. 161, 415 P.3d 976 (citing Pilgeram v. GreenPoint Mortg. Funding, Inc. , 2013 MT 354, ¶ 9, 373 Mont. 1, 313 P.3d 839 ). Summary judgment may only be granted "when there is a complete absence of genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Saucier v. McDonald's Rests. of Mont., Inc. , 2008 MT 63, ¶ 33, 342 Mont. 29, 179 P.3d 481. When assessing whether a genuine issue of material fact exists, we view all evidence in the light most favorable to the nonmoving party. Borges , ¶ 16. If the moving party shows the absence of a genuine issue of material fact and is entitled to judgment as a matter of law, the burden then shifts to the nonmoving party to prove, "by more than mere denial and speculation, that a genuine issue does exist." Borges , ¶ 16 (citing Valley Bank v. Hughes , 2006 MT 285, ¶ 14, 334 Mont. 335, 147 P.3d 185 ). We review a district court's conclusions of law by determining whether the district court's interpretation and application of the law was correct. Borges , ¶ 16.
DISCUSSION
¶11 When construing provisions of the MHRA, we look to guidance from federal anti-discrimination law under the Americans with Disabilities Act (ADA). Borges , ¶ 33. The MHRA prohibits discrimination in employment because of one's physical or mental disability. Section 49-2-303(1)(a), MCA. Discrimination under the MHRA includes "the failure to make reasonable accommodations that are required by an otherwise qualified person who has a physical or mental disability." Section 49-2-101(19)(b), MCA ; see McDonald v. Dep't of Envtl. Quality , 2009 MT 209, ¶ 40, 351 Mont. 243, 214 P.3d 749 ("[A]n employer has a duty to provide a reasonable accommodation to a person with a physical or mental disability if, with such accommodation, the person could perform the job's essential functions."). Reasonable accommodations include, but are not limited to, "job restructuring," "acquisition or modification of equipment or devices," and "reassignment to vacant positions which the employee is **278 qualified to hold." Admin. R. M. 24.9.606(3)(b). "As long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform his job, an employer is liable for failing to attempt that accommodation." Humphrey v. Mem'l Hosps. Ass'n , 239 F.3d 1128, 1136 (9th Cir. 2001) (internal quotations omitted); accord Borges , ¶ 35. Moreover, "the duty to accommodate is a continuing duty that is not exhausted by one effort." Dark v. Curry County , 451 F.3d 1078, 1089 (9th Cir. 2006). Nevertheless, "[a]n accommodation that would require an undue hardship or that would endanger the health or safety of any person is not a reasonable accommodation." Section 49-2-101(19)(b), MCA.
¶12 Before an employer takes specific actions to accommodate the employee, "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Mengine v. Runyon , 114 F.3d 415, 420 (3rd Cir. 1997).[2] They must engage in an "interactive process." Mengine , 114 F.3d at 420. In Mengine , the Third Circuit Court of Appeals defined how the duties of both employer and employee work together during the interactive process when the *95 parties have determined reassignment is a potential reasonable accommodation:
[T]he employee has the duty to identify a vacant, funded position whose essential functions he is capable of performing. But we do not suggest that the employee has the burden of identifying an open position before the employer's duty of accommodation is triggered. In many cases, an employee will not have the ability or resources to identify a vacant position absent participation by the employer. Simply put, a disabled employee seeking reassignment will be best served by employer and employee working together to identify suitable positions.
Mengine , 114 F.3d at 420 (citing Shiring v. Runyon , 90 F.3d 827, 832 (3rd Cir. 1996) ) (internal citations omitted).
¶13 When an employee notifies his employer of his disability and a desire for an accommodation, "that notification triggers the employer's obligation to engage in an 'interactive process' with the **279 employee to identify potential reasonable accommodations." Borges , ¶ 33 (quoting Barnett v. U.S. Air, Inc. , 228 F.3d 1105, 1114 (9th Cir. 2000), vacated on other grounds by US Airways, Inc. v. Barnett , 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002) ). The interactive process requires "(1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." United States EEOC v. UPS Supply Chain Solutions , 620 F.3d 1103, 1110-11 (9th Cir. 2010).
¶14 The employer and employee have a "shared goal," which is "to identify an accommodation that allows the employee to perform the job effectively." Borges , ¶ 33 (quoting Barnett , 228 F.3d at 1114-15 ). To accomplish their shared goal, both employer and employee must communicate directly and exchange essential information; neither side can delay or obstruct the process. Borges , ¶ 33 (quoting Barnett , 228 F.3d at 1114-15 ). The process requires both parties to act in good faith. "[N]either party should be able to cause a breakdown in the [interactive] process for the purpose of either avoiding or inflicting liability." Beck v. Univ. of Wis. Bd. of Regents , 75 F.3d 1130, 1135 (7th Cir. 1996). A party's obstruction, delay, or failure to communicate signals the party may be acting in bad faith. "In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility." Beck , 75 F.3d at 1135.
¶15 A claim that an employer failed to engage in an interactive process with an employee is "qualitatively different" from a claim that an employer failed to provide a reasonable accommodation. Borges , ¶ 34. We held in Borges :
An interactive dialogue violation may be defined as a failure by the employer to communicate with the employee about potential accommodations, whereas a reasonable accommodation violation refers to the employer's ultimate failure to take action that would permit an otherwise-qualified employee to perform his essential job functions.
Borges , ¶ 34 (internal citations omitted). Nevertheless, though these two claims are different, under the MHRA, the requirements for both parties to engage in an interactive process and for the employer to provide a reasonable accommodation are functionally related. Both parties must engage in the interactive process to identify reasonable accommodations to begin with. We will not hold the employer liable for failure to reasonably accommodate the employee where the facts and circumstances indicate the interactive process broke down through the **280 fault of the employee. "Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the [interactive process] breakdown." Beck , 75 F.3d at 1137. Where the employer "was never able to obtain an adequate understanding of what action it should take, it cannot be held liable for failure to make reasonable accommodations." Beck , 75 F.3d at 1137 (internal quotations omitted).
¶16 Alexander argues the District Court erred by granting MDC's motion for summary judgment because he demonstrated genuine issues of material fact about whether *96 MDC engaged in an interactive process with him and whether it provided a reasonable accommodation for him. Specifically, Alexander argues he raised genuine issues of material fact as to whether MDC could have plausibly accommodated him by reassignment to certain vacant positions prior to his termination.
¶17 After Alexander notified MDC his disability and medical restrictions were permanent and began discussing accommodations with Shepherd and Gilmer, his actions triggered MDC's "obligation to engage in an 'interactive process' " with Alexander to identify potential reasonable accommodations. Borges , ¶ 33. MDC and Alexander then had a shared goal to "identify an accommodation"-including "job restructuring," "acquisition or modification of equipment or devices," or "reassignment to vacant positions" which Alexander was qualified to hold-that would allow Alexander to perform his job effectively. Admin. R. M. 24.9.606(3)(b); Borges , ¶ 33. MDC first worked with Alexander to see whether he could wear a shoulder brace or other support. After learning a shoulder brace could not help Alexander, MDC considered Alexander's proposed accommodation where he asked MDC to staff at least two direct support professionals with him while he was on-duty. Ultimately, MDC found Alexander's proposed accommodation unfeasible, and Alexander does not dispute its decision. From there, unfortunately, Alexander and MDC were unable to identify a reasonable accommodation that would allow Alexander to remain as shift manager.
¶18 After the parties realized no accommodation would permit Alexander to maintain his current position, they began discussing reassignment. At that point, Alexander had a duty to identify a vacant position whose essential functions he was capable of performing. Although there are cases where, absent participation by the employer, "an employee will not have the ability or resources to identify a vacant position," this was not such a case. Mengine , 114 F.3d at 420. Gilmer identified specific positions Alexander may have qualified for.
**281 Shepherd advised Alexander to research vacant positions posted both internally within MDC and publicly on the State of Montana website. Shepherd also told Alexander he would research positions suited to Alexander's qualifications if Alexander provided Shepherd with his qualifications, education, and training.
¶19 The undisputed facts indicate MDC acted in good faith to assist in the search for a reasonable accommodation: MDC considered a shoulder brace, Alexander's proposed solution, and finally, reassignment. However, after the parties began considering reassignment, Alexander's failure to communicate further with MDC caused the interactive process to break down. Alexander never supplied MDC with the information Shepherd requested. Although he informed Gilmer he was unqualified for a vacant data control technician position, he failed to follow up with her regarding the vacant maintenance position. He did not inquire further about any vacant positions Shepherd informed him MDC posted internally and publicly, either. Without that information or further communication from Alexander, MDC was unable "to obtain an adequate understanding" of the actions it needed to take to accommodate Alexander-specifically, how to reassign Alexander to a position he was qualified to hold. Beck , 75 F.3d at 1137. Accordingly, we cannot fault MDC for never reassigning Alexander.
¶20 In his briefs, Alexander claims MDC should be held liable because its act of identifying potential vacant positions did not constitute a reasonable accommodation. Alexander also argues that if any open position he may have qualified for was available to MDC, it should be held liable for failing to reassign him. However, when MDC identified vacant positions and requested further qualification information from Alexander these actions were only one part of a greater interactive process to identify a reasonable accommodation for Alexander-one that required both parties' interaction. Even if there were open positions available to MDC that Alexander may have qualified for, MDC simply could not determine whether Alexander was qualified or interested in them without his input. Alexander himself hampered the interactive process and prevented MDC from reasonably accommodating him through a reassignment.
*97 ¶21 MDC met its obligations to involve Alexander in an interactive process, even if the process was incomplete: Alexander, Shepherd, and Gilmer all discussed and explored potential accommodations; Shepherd and Gilmer considered Alexander's proposed accommodation; and, after finding Alexander's proposed accommodation unworkable, Shepherd and Gilmer offered to work with Alexander to search for a **282 vacant position for reassignment. See UPS Supply Chain Solutions , 620 F.3d at 1110-11. Although MDC ultimately did not reassign Alexander, the undisputed facts show MDC made a good faith effort to engage in an interactive process with Alexander to identify potential reasonable accommodations. The subsequent breakdown in the interactive process is solely attributable to Alexander.
CONCLUSION
¶22 Under the MHRA, we will not hold an employer liable for a failure to reasonably accommodate an employee where the facts and circumstances indicate that the employer made a good faith effort to engage in an interactive process to reasonably accommodate the employee and, through the fault of the employee, the interactive process broke down, preventing the employer from realizing the information needed to proceed. The undisputed facts show MDC made a good faith effort to engage in the interactive process, while Alexander did not.
¶23 Accordingly, we affirm the District Court's decision to grant MDC's motion for summary judgment.
We concur:
BETH BAKER, J.
INGRID GUSTAFSON, J.
DIRK M. SANDEFUR, J.
JIM RICE, J.

In 2017, House Bill 387 extended MDC's closure date through June 2019 and provided for the continued use of a twelve-bed Intensive Behavior Center. 2017 Mont. Laws 762. During the pertinent events of this case, however, the parties believed MDC would close in June 2017.

In Mengine , although the plaintiff brought suit under the Rehabilitation Act of 1973, the case is still helpful for analyzing the requirements for an interactive process and reasonable accommodation under the MHRA due to the similarities and close relationship between the Rehabilitation Act and the ADA. In 1992, Congress amended the Rehabilitation Act to incorporate the standards of several sections of the ADA, including the section defining "reasonable accommodation." Mengine , 114 F.3d at 420.