DA 07-0376

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 209

JANELLE McDONALD,

      Charging Party, Respondent
      and Appellant,

      v.

DEPARTMENT OF ENVIRONMENTAL QUALITY,

      Respondent, Petitioner
      and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
                    In and For the County of Lewis and Clark, Cause No. CDV-2007-074
                    Honorable Thomas C. Honzel, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

             Philip A. Hohenlohe (argued), Hohenlohe, Jones, PLLP, Helena, Montana

             Elizabeth Brenneman, Montana Advocacy Program, Helena, Montana

      For Appellee:

             James M. Madden (argued), Montana Department of Environmental
             Quality, Helena, Montana

      For Amici Curiae:

             James P. Reynolds, Reynolds, Motl and Sherwood, PLLP, Helena,
             Montana (for American Association of People with Disabilities,
             Judge David L. Bazelon Center for Mental Health Law, Psychiatric
             Service Dog Society, and National Spinal Cord Injury Association)

Argued: April 28, 2008
Submitted: June 9, 2009
Decided: June 17, 2009

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Janelle McDonald filed a complaint with the Montana Department of Labor and Industry alleging that her former employer, the Montana Department of Environmental Quality (DEQ), had unlawfully discriminated against her. Following a contested case hearing, the hearing examiner issued a Final Agency Decision granting judgment in favor of McDonald and awarding damages. The Human Rights Commission affirmed.

¶2 DEQ then filed a petition for judicial review in the First Judicial District Court, Lewis and Clark County. The District Court reversed the decision of the Human Rights Commission, and McDonald now appeals. For the reasons detailed below, we reverse the District Court's decision and remand for further proceedings.

## BACKGROUND

### McDonald and her Service Dog, Bess

¶3 The Montana Department of Public Health and Human Services (DPHHS) certified McDonald in July 2002 as a person with a disability for the purpose of employment preference. *See* § 39-30-107, MCA. In so doing, DPHHS determined that McDonald has "a physical or mental impairment" which "substantially limits one or more major life activities" and which "limits [her] ability to obtain, retain, or advance in employment." *See* § 39-30-103(4), MCA; Admin. R. M. 2.21.1427(2).

¶4 McDonald actually has two permanent disabilities, which she had at all times pertinent to this case. First, she has a physical injury to her left leg caused by a fracture received a number of years ago. This injury hinders her ability to navigate stairs, to walk on certain surfaces (particularly hard surfaces, such as concrete floors), and to walk long

3

distances.  Second, McDonald suffers from chronic depression and dissociative identity disorder.  During bouts of depression, she experiences poor concentration, poor memory, and a sense of isolation.  She withdraws from social interaction and, on occasion, misses work.  During dissociative episodes, McDonald becomes inattentive and unable to complete tasks.  She also loses track of time and her surroundings, and she may have no memory afterward of interactions and events which took place during a dissociative period.  Dissociative episodes come on suddenly and without warning, can last a few minutes or several hours, and may occur a few times a week or several times a day.

¶5      For assistance in overcoming the limitations caused by her disabilities, McDonald uses a specially trained service dog (an Australian Shepherd) named Bess.  She acquired Bess in 1999 from CARES Inc., a nonprofit organization that trains and provides service animals for disabled persons.  In this regard, Amici Curiae[1] explain that service animals help many persons with disabilities to achieve greater functional independence.  While the classic use of service animals is to lead visually-impaired persons (as guide dogs), Amici report that service animals are used for many other purposes—for example, they may alert hearing-impaired persons to aural stimuli, fetch items or provide stabilizing support for persons with physical impairments, and alert persons with seizure disorders of impending seizures.  In addition, service animals are used with increasing frequency by persons with mental disabilities—for example, they may facilitate social interactions for persons with severe social anxiety or assist individuals who experience panic attacks.

---

[1]  American Association of People with Disabilities, Judge David L. Bazelon Center for Mental Health Law, Psychiatric Service Dog Society, and National Spinal Cord Injury Association.

4

Similarly, a CARES representative who testified at the contested case hearing explained that CARES trains service dogs to provide both physical support (e.g., retrieving, bracing, pulling a wheelchair, turning light switches on and off, and opening doors) and emotional support (e.g., alerting to a person's mental state and interacting with the person depending on his or her particular need). Service animals are not considered pets; rather, Amici explain, they are specially trained to attend to the specific needs of their owners and, in this respect, are a type of assistive device. *Cf.* Admin. R. M. 37.90.449(6) ("A service animal is an animal trained to undertake particular tasks on behalf of a recipient that the recipient cannot perform and that are necessary to meet the recipient's needs for accessibility, independence, health, or safety."); *see also* 28 C.F.R. § 36.104.

¶6     Bess is trained to assist McDonald in a number of ways related to McDonald's specific physical and emotional limitations. In particular, Bess provides bracing support (e.g., when McDonald is going up and down stairs) and assists McDonald to stand up if she falls. Bess also provides tactile stimulation in the event of a dissociative episode. Bess senses when an episode is occurring and bumps into or nudges McDonald until she calms down and comes back into reality. Bess also helps McDonald with her depression by preventing McDonald from oversleeping and by keeping McDonald active. In short, Bess increases McDonald's mobility and alleviates barriers to interpersonal interaction.

**The Events Leading up to McDonald's Discrimination Complaint**

¶7     McDonald began working for DEQ as a fiscal officer in August 2002. She informed DEQ that she was a person with a disability and that she needed to utilize Bess at work in order to carry out her job duties. DEQ, in turn, acknowledged that McDonald

5

had a disability and held a meeting with the employees who would be working with her to advise them that McDonald was disabled and would be using a service dog at work.

¶8 McDonald's workstation was located in Room 3 on the ground floor of DEQ's building (the Metcalf Building) in Helena, Montana. The floor of Room 3 was carpeted, but the ground-floor hallways were tiled with linoleum flooring. These hallways connected Room 3 to other parts of the building that McDonald regularly traveled to, including the building entrance/exit, the restroom, the elevator, and certain meeting rooms. Thus, in order to reach these locations, McDonald and Bess (who accompanied McDonald) had to travel down the tiled hallways.

¶9 Bess was nine years old, healthy, and energetic when McDonald started her job at DEQ. Bess had been trained successfully to walk on a variety of surfaces, including buffed tile floors and slippery surfaces. McDonald noticed, however, that Bess had difficulty maintaining traction on the tile floors of the Metcalf Building. Bess slipped on these floors repeatedly and, as a result, became nervous and reluctant to walk on them.

¶10 McDonald contacted CARES and was advised to have Bess practice walking on tile floors. Accordingly, McDonald took Bess into the Metcalf Building on the weekends and to stores such as Wal-Mart and Kmart a couple of times per week. Nevertheless, Bess continued to have difficulty on DEQ's floors. McDonald tried dog booties, but those did not solve the slipping problem; and, in any event, CARES did not recommend using dog booties because they could contribute to health issues, such as fungus. As part of Bess's regular grooming, McDonald trimmed Bess's toenails and the fur between her toes. A veterinarian examined Bess and concluded that her slipping was not due to a

6

medical condition (such as arthritis, long toenails, or age). Likewise, CARES concluded that the slipping was not due to improper handling. CARES had no other suggestions for solving the traction issue aside from altering the surface of the floor.

¶11 To that end, McDonald requested that DEQ provide nonskid floor coverings (such as runners or carpeting) in the ground-floor hallways of the Metcalf Building. She first made this request verbally in March 2003 and then reiterated it in writing several times over the next 17 months. However, by the time she left her position with DEQ in August 2004, DEQ had not made a decision about providing this accommodation. The following paragraphs detail the relevant events which transpired during this period.

¶12 McDonald explained Bess's situation to her supervisor, Elizabeth Danzer, in March 2003 and requested that DEQ put something down in the hallways to prevent Bess from slipping. Danzer relayed this request to Deputy Director Thomas Livers, who in turn passed it on to the Department of Administration's General Services Division (the agency that addresses maintenance issues in the Metcalf Building and other buildings in the Capitol Complex). It is not clear exactly when DEQ first informed General Services of the issue, but it is clear that General Services was aware of it by mid-July 2003. In this connection, Doug Olson (General Services' facilities manager) sent a letter to DEQ on July 1 stating that General Services would be conducting a facilities condition inventory of the Metcalf Building on July 15 and requesting that DEQ contact him regarding "known maintenance deficiencies and/or special access requirements or procedures." DEQ prepared a list dated July 15, 2003, and titled "Concerns and Special Access Requirements as reported by DEQ." Two of the line items on the list stated as follows:

7

- Area: "Tiled & Travertine surfaces." Concern: "Slippery conditions exist always but esp when wet." Suggested Fix: "Floor runners or non-slip strips (ground floor especially bad)."

- Area: "Hallways." Concern: "Special Access to assist Canine Assistant." Suggested Fix: "Carpet runners, ext. door to room 35, hall corner, vend mach."[2]

¶13    After making her initial request for nonskid floor coverings, McDonald repeatedly followed up on the matter with Danzer and other DEQ employees. She believed that DEQ was working to resolve the matter. Meanwhile, Bess continued to have difficulty on the tile floors and by late summer had slipped and fallen on several occasions. In one instance, which occurred on September 5, 2003, Bess fell with her legs splayed out, hit her chin on the floor, and needed assistance getting up.

¶14    Because several months had passed since her initial request, but a nonskid surface had not been provided, McDonald conferred with her vocational rehabilitation counselor and CARES and decided to put her request in writing. On September 15, 2003, she sent an email to Virginia Cameron (DEQ's human resources manager) with the subject heading "ADA Accommodation."[3] McDonald explained that Bess had slipped and fallen "numerous times" on the tile floors of the Metcalf Building and that the continued falls were impairing Bess's ability to work. She further explained that in discussing the matter

---

[2] Room 35 (shown on the diagram in ¶ 15 below) is a ground-floor meeting room. Incidentally, we note some confusion in the parties' briefing and the hearing examiner's decision as to whether DEQ or General Services generated the list of "Concerns and Special Access Requirements as reported by DEQ." Evidence in the record indicates that the list was prepared by a DEQ employee. But regardless of who prepared it, the point here is that DEQ knew that slippery conditions always existed on the tiled and travertine surfaces of the Metcalf Building, and nonskid floor coverings were suggested to resolve this problem and to assist McDonald and Bess.

[3] "ADA" is short for the Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327, *as amended*, 42 U.S.C. §§ 12101-12213.

with CARES, it had been determined that nonskid mats and runners would be the most practical solution and that nonslip dog booties were not a viable option. Thus, McDonald requested the following accommodation:

> 1. The placement of non-skid runners in the ground floor corridor in the Metcalf Building from the North entry doors to the single bathroom at the East end of the hallway. To minimize the expense the runners should be placed along the West and South side of the hallway.
> 2. One runner from the west wall to Room 35, and
> 3. One runner from the west wall to the ladies restroom.

¶15 The following diagram (provided in the record, but with labels added) depicts the layout of the ground floor of the Metcalf Building. The heavy black lines represent McDonald's requested placement of nonskid runners along the west and south sides of the hallways. In addition, McDonald regularly attended two or three meetings per week, which usually were held in Rooms 35 and 44 (noted on the diagram).



9

¶16    Cameron forwarded McDonald's email to Doug Olson at General Services, with the request: "Please work with me in accomplishing a non-skid hallway in the bottom floor of the Metcalf building." Four weeks passed without a response; thus, Cameron forwarded the email string (McDonald's message to Cameron and Cameron's message to Olson) to Constance Enzweiler (the State ADA coordinator). Enzweiler, in turn, got in touch with Olson's supervisor, who remarked that she could not excuse Olson's failure to respond to Cameron and that she would bring the matter up with Olson right away. In the meantime, Enzweiler conducted some independent research and concluded that while DEQ had to provide McDonald with a reasonable accommodation, "allowing the service animal to come to work to provide the service to the employee was the reasonable accommodation." Enzweiler did not believe that DEQ had to go further and modify the surface of its hallway floors. She advised DEQ of these conclusions.

¶17    In November 2003, General Services delivered three mats to DEQ. One measured six feet by ten feet and was placed at the north entrance to the building. The other two measured three feet by five feet and were placed at the door to Room 3 and at the ground-floor elevator. Thus, large areas of the tile floors remained uncovered. Indeed, the mats did not provide a covered path from McDonald's office to any other part of the building. McDonald told Danzer and Cameron that the mats were inadequate and not what she had requested. McDonald agreed to try the mats, but Bess continued to suffer slips and falls on a regular basis and thus became increasingly reluctant to walk on the tile floors.

¶18    In mid-January 2004, Bess again slipped and fell on the floor. She was in lingering discomfort an hour or two later, so McDonald took her to a veterinarian, who

determined that Bess was experiencing severe pain in her neck and also "root signature pain" (pain caused by a pinching of the nerve or the spinal cord) in her left leg and shoulder. Furthermore, although Bess's toenails were somewhat long, they were not the cause of the fall; rather, the slipperiness of the tile flooring was the cause. The vet took x-rays and found that Bess had cervical disk disease as a result of the slip and fall. He also determined that while Bess had a "hint" of preexisting osteoarthritis in her shoulders, it was not severe and not the cause of her present pain. He prescribed anti-inflammatory medications and "enforced rest." As a result, McDonald was unable to utilize Bess's services at work for two weeks while Bess recovered. Moreover, although Bess's condition eventually improved, she was not the same. For example, she no longer could perform her bracing function, and she sometimes walked with a pronounced limp.

¶19 McDonald again spoke with Danzer about Bess's situation and reiterated her request for nonskid floor coverings along the west and south walls of the ground-floor hallways. In addition, McDonald informed Livers, Cameron, and Wendy Forgey (DEQ's occupational safety and health specialist) that the three mats placed at the doorways in November were insufficient and that Bess had continued to slip and fall on the tile floors. Forgey accordingly emailed Doug Olson on January 22, 2004, stating: "We need something to help prevent slips and falls in the hallway, and there have been some concerns raised about the Service Dog that is currently being used in the building slipping and hurting her back." Initially, Forgey thought that McDonald just wanted larger mats, but McDonald made it clear that she needed a nonskid floor covering along the entire length of the hallways (as requested in her September 15, 2003 email).

11

¶20 Olson met with Forgey on February 19, 2004, and informed her that General Services would not pay for runners or carpeting but that DEQ could pay for them out of its own budget. Olson did not recommend one over the other (runners versus carpeting), but he did offer to assist in obtaining price and product information. This information, however, was not forthcoming, and Forgey concluded that General Services was not treating the matter with "appropriate urgency." Meanwhile, Susan Smith (a DEQ purchasing agent who worked in the same office as McDonald) researched runners for the ground-floor hallways and estimated the cost to be between $1,500 and $2,000. McDonald forwarded this information to Danzer.

¶21 In March 2004, Bess again slipped, fell, and hit her chin on the floor. She was limping and having difficulty afterward, so McDonald took her back to the veterinarian, who determined that Bess had suffered a soft-tissue injury to her left shoulder as a result of this slip and fall. The vet noted that Bess's toenails were "in good shape" and not too long, but he thought this injury could be associated with the root signature problem from the January injury. Bess was noticeably less agile after the March fall.

¶22 On March 24, 2004, McDonald sent an email to Cameron, Forgey, Danzer, and Livers explaining that Bess had fallen again and required veterinary care. McDonald again requested that DEQ put nonskid carpets in the ground-floor hallways. She also requested, for the first time, that carpets be placed from the first- and second-floor elevator doors to the carpeted areas of each of those floors (a distance of ten to fifteen feet on the first floor and five to ten feet on the second floor). She made the latter request because she was having to travel more frequently to the upper floors for meetings.

12

¶23 On April 14, 2004, Forgey met again with Olson to discuss the overall safety of the Metcalf Building. Afterward, Forgey drafted a memo to Cameron (copied to Livers) in which she recapped the issues she and Olson had discussed, including "our wish to have carpet or runners placed in the main hallway downstairs." Forgey reported that Olson "was not inclined to pay for this request, but that if we chose to pursue it, he would provide assistance and product information to us." Forgey suggested that "this is an option we should look into[;] however, I would like to pursue gaining some additional funds as an ADA accommodation."

¶24 By this point in time, McDonald often left Bess at home due to the difficulty Bess had on DEQ's tile floors and because McDonald feared that Bess might sustain additional injuries. But without Bess to accompany her, McDonald worried she would fall and be unable to get up or would lose time during dissociative episodes. McDonald had further conversations with Danzer, Forgey, and Livers regarding her request for nonskid floor coverings, but to no avail. By May 2004, McDonald had lost faith that DEQ would ever comply with her request, and she began looking for a new job.

¶25 On July 9, 2004, Olson provided Forgey with price and product information. According to Olson, runners for the ground-floor hallways would cost $7,500 to $8,000 and would need to be replaced every six or seven years. Carpeting would cost $12,808. At this time, DEQ had a large surplus in its proprietary fund and indisputably could have afforded $13,000 for runners or carpeting. Upon learning of these estimates, McDonald told Danzer that she did not expect DEQ to carpet the entire hallway if runners would suffice. Danzer then suggested that she (Danzer) could schedule all meetings in Room

35, which might eliminate the need for runners down the east-west hallway (*see* diagram in ¶ 15, *supra*). The problem with this proposal, however, was that Danzer did not control where other DEQ personnel scheduled meetings that McDonald had to attend. Moreover, runners would still be needed from the north entrance to Room 3 and from Room 3 to the restroom, the elevator, and Room 35.

¶26 After McDonald received a job offer from another agency in July 2004, Livers asked her what it would take to keep her at DEQ. McDonald replied that DEQ needed to do something about the slippery tile floors. She also requested a raise of $2.00 per hour, but she emphasized that she would not stay unless the floor problem was resolved. Livers responded that he would continue to work on these issues but would not guarantee anything. McDonald ultimately left DEQ on August 6, 2004. At that time, DEQ still had not made a decision about providing McDonald's requested accommodation, despite the passage of roughly 17 months since she first brought the issue to DEQ's attention and 11 months since she first put her request in writing.

¶27 After consulting with CARES, McDonald retired Bess since Bess had become limited in her ability to assist McDonald and McDonald did not want to risk any more injuries. The CARES representative who testified at the contested case hearing felt that in light of Bess's physical injuries and her inability to perform service-related duties, McDonald's decision to retire her was appropriate.

¶28 McDonald testified that because she was so dependent on Bess, the loss of Bess's services affected her in a number of ways. She has a higher frequency of absences at her present job than she had at DEQ. She has difficulty completing her work in a timely

14

fashion, and she loses hours of time during dissociative episodes. She is more limited in her ability to engage in physical activities. She suffers more panic attacks and is afraid to leave the house. Her lessened ability to go out in public has worsened her depression, and she has increased the dose of her antidepressants.

**McDonald's Complaint and the Hearing Examiner's Decision**

¶29 McDonald filed her complaint with the Department of Labor and Industry on January 6, 2005, alleging that DEQ had unlawfully discriminated against her in violation of the Montana Human Rights Act (MHRA) and the ADA. The Department held a two-day contested case hearing in December 2005 and January 2006, and the hearing examiner issued the Final Agency Decision in August 2006.

¶30 At the outset of his analysis, the examiner noted there was no dispute that McDonald was disabled within the meaning of the MHRA and was qualified for her position with DEQ. The examiner then considered and rejected DEQ's argument that McDonald did not need the accommodation she sought. The examiner found that McDonald had to travel from her workstation in Room 3 to other parts of the ground floor and to other floors of the Metcalf Building in order to attend meetings, carry out the other functions of her job, and access the restroom; and in order to move about the building, McDonald needed Bess for the stabilizing function and tactile stimulation Bess provided. Thus, the examiner held that the placement of nonskid floor coverings was necessary to enable McDonald to accomplish her job duties.

¶31 DEQ had argued that the accommodation was for Bess, not McDonald, and that DEQ was not required to accommodate the service dog; however, the examiner agreed

15

with McDonald that this was "analogous to arguing that failing to build an affordable wheelchair ramp for an otherwise qualified paraplegic who must use a wheelchair to access her job is not discrimination because there is no obligation to accommodate the wheelchair." Likewise, the examiner rejected DEQ's contention that the accommodation was not reasonable, observing that the cost was "relatively minimal" compared to DEQ's overall financial condition and that runners would not pose a safety hazard.

¶32 Turning to the question of delay, the examiner found that DEQ "clearly knew that McDonald needed the accommodation she sought" but "inexplicably and unreasonably failed to obtain the runners or make other reasonable provision to accommodate McDonald." In this regard, the examiner observed that the only other course of accommodation that DEQ discussed with McDonald—holding meetings in Room 35—was not a "viable" solution. Likewise, DEQ had argued that the three small mats provided in November 2003 were an adequate remedy; however, the examiner pointed out that the mats "covered only a very small portion of the area that needed coverage" and that McDonald had found them to be ineffective, which she communicated to DEQ.

¶33 The examiner found that DEQ had provided "no rational basis for the 1½-year delay that obviously affected McDonald in her employment." The examiner attributed DEQ's conduct to "stereotypical institutional inertia" and held that the "inordinate delay" in providing, and the ultimate failure to provide, the accommodation McDonald requested "was a violation of the law."

¶34 Having concluded that DEQ unlawfully discriminated against McDonald, the examiner imposed injunctive relief and awarded damages: $10,000.00 for emotional

distress, $18,000.00 for a replacement service animal, $1,536.00 for travel expenses to procure the replacement service animal, and $333.84 for veterinary bills.

**Subsequent Proceedings**

¶35 DEQ appealed to the Human Rights Commission (HRC), which affirmed the Final Agency Decision. DEQ then petitioned for judicial review in the District Court, which reversed the HRC's decision. The District Court began with the premise that DEQ had met its duty to provide a reasonable accommodation "by allowing McDonald to use her service animal in the workplace." The court then turned to what it perceived as "the novel issue" in this case: "Did DEQ have a legal duty to provide an accommodation for the service animal?" The court answered this question in the negative, stating that "[t]here is no precedent under the MHRA or its federal counterpart, the ADA, to require an employer to make physical alterations to the workplace to accommodate the special needs of a service animal." The court noted that under 28 C.F.R. § 36.302(c)(2), the operator of a public accommodation is not required to "supervise or care for" a service animal, and the court refused to "expand the MHRA to require employers to accommodate a service animal." Lastly, the court impugned the hearing examiner's factual determinations concerning Bess's functionality and the cause of her falls. Citing testimony from the contested case hearing, the court observed that Bess had been trained to walk on all types of surfaces, including floors similar to those in the Metcalf Building. On these grounds, the court held that DEQ did not have a legal duty to provide the requested accommodation. Thus, the court did not analyze the other issues raised in DEQ's petition for judicial review and supporting brief—namely, whether McDonald's

17

requested accommodation would have imposed an undue hardship upon DEQ or endangered the health or safety of any person, whether McDonald suffered an adverse employment action on account of her disability, and whether the hearing examiner's award of damages was clearly erroneous. McDonald now appeals.

## ISSUES

¶36 McDonald and DEQ argue five issues on appeal:

1. Whether McDonald needed an accommodation.

2. Whether modifying a floor surface so that an employee with a disability can use her service dog effectively within the workplace is beyond the scope of an employer's duties under the MHRA.

3. Whether McDonald's requested accommodation was reasonable.

4. Whether DEQ's delay in providing a reasonable accommodation amounted to an adverse employment action.

5. Whether the hearing examiner's award of damages is clearly erroneous.

¶37 We address Issues 1 and 2 in this Opinion and remand this case to the District Court with instructions to analyze the remaining issues, under the applicable standards of review, in the first instance.

## STANDARDS OF REVIEW

¶38 The standards for reviewing a final decision of the HRC are whether the agency's findings of fact are clearly erroneous and whether its interpretation and application of law are correct. Section 2-4-704(2)(a), MCA; *Denke v. Shoemaker*, 2008 MT 418, ¶ 39, 347 Mont. 322, 198 P.3d 284. Review of the decision is confined to the record, § 2-4-704(1),

18

MCA, and the reviewing court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact, § 2-4-704(2), MCA. This Court employs these same standards when reviewing the district court's order affirming or reversing the HRC's decision. *Denke*, ¶ 39. We review the whole record to determine whether the administrative findings are clearly erroneous and whether the agency correctly interpreted the law. *Total Mechanical Heating v. UEF*, 2002 MT 55, ¶ 23, 309 Mont. 84, 50 P.3d 108; *Pannoni v. Board of Trustees*, 2004 MT 130, ¶ 25, 321 Mont. 311, 90 P.3d 438.

## DISCUSSION

### Background Legal Principles

¶39 It is unlawful for an employer to discriminate against a person in a term, condition, or privilege of employment because of physical or mental disability unless the reasonable demands of the position require a distinction based on physical or mental disability. Section 49-2-303(1)(a), MCA. "Physical or mental disability" includes "a physical or mental impairment that substantially limits one or more of a person's major life activities." Section 49-2-101(19)(a)(i), MCA; *accord* 29 C.F.R. § 1630.2(g)(1).[4] "Major life activities" means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, writing, and mobility. *See* Admin. R. M. 2.21.1427(2); 29 C.F.R. § 1630.2(i); *Pannoni*, ¶ 26.

---

[4] Because the MHRA is modeled on federal anti-discrimination laws, such as the ADA, it is useful and appropriate to consider federal statutes, regulations, and caselaw as persuasive authority when interpreting provisions of the MHRA. *See e.g. Campbell v. Garden City Plumbing and Heating*, 2004 MT 231, ¶¶ 12-14, 322 Mont. 434, 97 P.3d 546; *Pannoni*, ¶ 28; *Hafner v. Conoco Inc.*, 268 Mont. 396, 402, 886 P.2d 947, 950-51 (1994); *Martinell v. Montana Power Co.*, 268 Mont. 292, 303-04, 886 P.2d 421, 428-29 (1994); *McCann v. Dodson School Dist.*, 249 Mont. 362, 364, 816 P.2d 435, 437 (1991).

¶40    Discrimination based on physical or mental disability includes "the failure to make reasonable accommodations that are required by an otherwise qualified person who has a physical or mental disability." Section 49-2-101(19)(b), MCA; *accord* Admin. R. M. 24.9.604(3)(c), 24.9.606(1)(a).[5] A person with a physical or mental disability is qualified to hold an employment position "if the person can perform the essential functions of the job with or without a reasonable accommodation for the person's physical or mental disability." Admin. R. M. 24.9.606(2); *see also* 29 C.F.R. app. § 1630.9 ("An individual with a disability is 'otherwise qualified' . . . if he or she is qualified for a job, except that, because of the disability, he or she needs a reasonable accommodation to be able to perform the job's essential functions."). Accordingly, an employer has a duty to provide a reasonable accommodation to a person with a physical or mental disability if, with such accommodation, the person could perform the job's essential functions. *Pannoni*, ¶ 27. This duty to make reasonable accommodations is an essential part of Montana's anti-discrimination statutes. *Hafner v. Conoco, Inc.*, 1999 MT 68, ¶ 36, 293 Mont. 542, 977 P.2d 330. Similarly, the ADA was designed in part to integrate persons with disabilities into the economic and social mainstream of American life. *PGA Tour Inc. v. Martin*, 532 U.S. 661, 675, 121 S. Ct. 1879, 1889 (2001).

¶41    In the present case, there is no dispute that McDonald has physical and mental impairments which substantially limit one or more major life activities and that she was otherwise qualified to hold her position with DEQ.

---

[5] The interpretive rules contained in Title 24, chapter 9, subchapter 6 of the Administrative Rules of Montana are based on the rulemaking authority granted by § 49-2-204, MCA.

20

## ISSUE 1. Did McDonald need an accommodation?

¶42    As noted, the hearing examiner found that McDonald needed Bess to accompany her while at work for the stabilizing function and tactile stimulation Bess provided; however, Bess had difficulty maintaining traction in DEQ's hallways due to the slippery condition of the tile flooring. Thus, the examiner found that the placement of nonskid floor coverings was necessary to enable McDonald to perform her job duties.

¶43    DEQ disagrees. In DEQ's view, McDonald in fact did *not* need a service dog or runners in the hallways in order to perform the essential functions of her job. Because she left Bess at home roughly 50% of the time following Bess's injuries in January and March 2004, DEQ deduces that "McDonald was able to work without a service dog altogether." DEQ notes that Danzer was pleased with McDonald's work, and DEQ informs us that it "never considered the requested runners to be related to McDonald's job performance." Rather, DEQ maintains that it engaged in "voluntary efforts" to assist McDonald but did not have to provide her an accommodation "as a matter of law."

¶44    McDonald responds that DEQ is ignoring evidence in the record concerning the hardships she faced when Bess was not with her. For example, the hearing examiner found that McDonald was very dependent on Bess and that without Bess, she suffered dissociative episodes which could cause her to lose hours of time. McDonald notes that such episodes impacted her ability to do her job. McDonald also contends that she was not required to prove that she was "absolutely physically incapable" of performing her job without Bess and the requested accommodation. She notes that "[a] person who uses a wheelchair might be physically capable of dragging herself up the stairs to get to her

21

office[, but] this does not mean she is not entitled to a ramp." McDonald maintains that a disabled employee has the right to perform her job duties in reasonable comfort and enjoy the same freedom of movement as nondisabled employees. We agree with McDonald.

¶45 DEQ suggests that a disabled employee is entitled to an accommodation only if the accommodation is shown to be indispensable, 100% of the time, to her ability to perform essential job functions. We do not agree, however, that the law requires such an all-or-nothing showing. "The reasonable accommodation requirement is best understood as a means by which barriers to the equal employment opportunity of an individual with a disability are removed *or alleviated*"; thus, "if an adjustment or modification is *job-related, e.g.,* specifically *assists* the individual in performing the duties of a particular job, it will be considered a type of reasonable accommodation." 29 C.F.R. app. § 1630.9 (emphases added); *cf. Pannoni*, ¶ 28 ("If a reasonable accommodation available to an employer could plausibly enable a handicapped employee to adequately perform his or her job, [the] employer is liable for failing to attempt that accommodation."); *accord Humphrey v. Memorial Hospitals*, 239 F.3d 1128, 1136 (9th Cir. 2001).

¶46 Furthermore, in this connection, DEQ views its obligation too narrowly. "[E]mployers are not relieved of their duty to accommodate when employees are already able to perform the essential functions of the job." *Buckingham v. United States*, 998 F.2d 735, 740 (9th Cir. 1993); *see also Martinell v. Montana Power Co.*, 268 Mont. 292, 305, 314, 886 P.2d 421, 429, 435 (1994) (employer had duty to make reasonable accommodations even though the employee could perform her job without one). The duty to accommodate also includes making modifications or adjustments which enable an

employee with a disability to enjoy "equal benefits and privileges of employment" as are enjoyed by similarly situated employees without disabilities. *See* 29 C.F.R. § 1630.2(o)(1)(iii). Likewise, the duty includes providing an opportunity to attain "the same level of performance" as the average similarly situated nondisabled employee. *See* 29 C.F.R. app. § 1630.9. The duty even applies to nonwork facilities provided or maintained by an employer for use by its employees, such as restrooms and break rooms. *See* 29 C.F.R. app. §§ 1630.2(o), 1630.9. Fundamentally, "an employer is obligated not to interfere, either through action or inaction, with a handicapped employee's efforts to pursue a normal life." *Buckingham*, 998 F.2d at 740; *cf. McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir. 1992) ("The Rehabilitation Act calls for reasonable accommodations that permit handicapped individuals to lead normal lives, not merely accommodations that facilitate the performance of specific employment tasks."[6]).

¶47 For these reasons, we disagree with DEQ's contention that because McDonald worked 50% of the time without Bess and still managed to perform her job to DEQ's satisfaction, she did not need an accommodation. First of all, being able to work 50% of the time without Bess does not establish that "McDonald was able to work without a service dog altogether." But more importantly, McDonald was entitled to a reasonable accommodation if such accommodation could have assisted her in performing her job

---

[6] The Rehabilitation Act of 1973, 29 U.S.C. §§ 701-796l, is materially identical to the ADA, except that it is limited to programs that receive federal financial assistance. *Armstrong v. Davis*, 275 F.3d 849, 862 n. 17 (9th Cir. 2001). The substantive standards for determining liability under the two acts are the same. *Myers v. Hose*, 50 F.3d 278, 281 (4th Cir. 1995); *Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004). Thus, in this respect, cases interpreting the Rehabilitation Act or the ADA are interchangeable. *Wojewski v. Rapid City Regional Hospital*, 450 F.3d 338, 344 (8th Cir. 2006).

duties or alleviated barriers to her ability to enjoy equal benefits, privileges, and opportunities of employment. In this regard, DEQ overlooks the fact that when she was without Bess, McDonald had to perform her job duties under limitations to which similarly situated employees were not subjected, such as recurring dissociative episodes, difficulty walking, and the risk of falling without Bess's assistance to get up. The notion that she was required to endure these conditions to the absolute breaking point before she could be deemed to "need" an accommodation is contrary to the purposes of the MHRA and the ADA, and we accordingly reject it.[7] *See Vande Zande v. Wisconsin Dept. of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995) ("The duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in reasonable comfort."); *EEOC v. MCI Telecomm. Corp.*, 993 F. Supp. 726, 730 (D. Ariz. 1998) ("Clearly, the right not to be singled out, embarrassed and humiliated by one's employer as a result of a disability is a benefit or privilege of employment."); *Martinell*, 268 Mont. at 305, 886 P.2d at 429 (although the employee could perform her job, her ability to do so was substantially limited by pain which could be minimized through an accommodation).

---

[7] DEQ relies heavily on a decision of the United States District Court for the Northern District of Illinois in arguing that DEQ had no duty to provide McDonald's requested accommodation. Notably, however, the federal court rejected the employer's argument (the same as DEQ's here) that an accommodation was not required because the employee indisputably was able to work without her service dog. *See Branson v. West*, 1999 WL 311717 at *12, 1999 U.S. Dist. LEXIS 7343 at **34-36 (N.D. Ill. May 11, 1999). Moreover, the court ultimately ruled that the employee needed an accommodation to use her service dog at work in part because being separated from the service dog "impair[ed] her ability to function as a fully independent person" and "denied [her] the ability to confront her disability in the manner of her choosing." *Branson v. West*, 1999 WL 1186420 at *11, 1999 U.S. Dist. LEXIS 19392 at *30 (N.D. Ill. Dec. 10, 1999).

¶48    In light of these principles, DEQ's contention that the hearing examiner did not find the requisite degree of "need" for an accommodation is without merit; and DEQ's challenges to the examiner's findings, therefore, boil down to nothing more than arguments in favor of different findings. The standard of review, however, is not whether evidence supports different findings; it is whether the findings actually made are supported by substantial evidence. *See Benjamin v. Anderson*, 2005 MT 123, ¶ 55, 327 Mont. 173, 112 P.3d 1039. Here, testimony by McDonald, her psychologist, Bess's veterinarian, the CARES representative, Smith, and Danzer supports the findings that Bess assisted McDonald in performing her job duties by alleviating the hardships caused by her disabilities and that Bess had difficulty in DEQ's hallways due to the slippery condition of the tile flooring. We thus conclude that substantial evidence supports the examiner's ultimate finding that McDonald needed an accommodation.

### ISSUE 2.  Is modifying a floor surface so that an employee with a disability can use her service dog effectively within the workplace beyond the scope of an employer's duties under the MHRA?

¶49    DEQ makes three related but distinct arguments that McDonald's requested accommodation was beyond the scope of DEQ's duty under the MHRA:  (A) an employer is not required to accommodate a service animal, (B) an employer is not required to provide the sort of accommodation McDonald requested, and (C) an employer is not required to accommodate the user of a poorly performing assistive device. These three theories track the District Court's decision, and any one of them is a sufficient ground for holding in DEQ's favor. However, for the reasons which follow, we conclude that DEQ cannot prevail on any of them. We address each argument in turn.

25

## A. Accommodating McDonald vs. Accommodating Bess

¶50    DEQ asserts that there is no precedent for requiring an employer to make accommodations "for a service animal." As McDonald correctly points out, however, this case is not about accommodating a service animal; it is about accommodating an employee with physical and mental disabilities who uses a service animal as an assistive device. In this respect, the use of a service animal as an assistive device is no different than the use of a wheelchair, scooter, or walker as an assistive device. Requiring an employer to provide a nonskid floor surface so that an employee may use her service animal to move freely about the building is analogous to requiring an employer to provide a ramp or widen a door so that an employee may use his wheelchair to travel from one part of the building to another. When an employer does the latter (e.g., widens a door), it is an accommodation to the employee using the wheelchair, not to the wheelchair itself. Likewise here, installation of runners or carpeting would have been an accommodation to McDonald, not Bess.

## B. McDonald's Particular Requested Accommodation

¶51    Alternatively, DEQ maintains that employers are not required to provide the sort of accommodation McDonald requested. Citing *Branson v. West*, 1999 WL 1186420, 1999 U.S. Dist. LEXIS 19392 (N.D. Ill. Dec. 10, 1999), and 28 C.F.R. § 36.302(c), DEQ asserts that Bess's difficulty on DEQ's tile floors was a "care" or "behavior" issue which McDonald, not DEQ, was responsible to address. Moreover, DEQ argues that employers are not required to make facility modifications for disabled employees who use service animals.

¶52 In response, McDonald points out that *Branson* is unpublished and, moreover, that it is distinguishable in terms of the issues addressed in that case. McDonald also argues that § 36.302(c) is not applicable in the context of employment discrimination and, in any event, that she never asked DEQ to take responsibility for Bess's "care, control, or behavior." She maintains that her requested accommodation of runners or carpeting "easily falls within the broad contours" of DEQ's duty under the MHRA.

¶53 With respect to *Branson*, we first note that unpublished decisions of other courts may be cited as legal authority to the extent the rules of the rendering court allow, *see e.g. McDermott v. Carie*, 2005 MT 293, ¶ 23, 329 Mont. 295, 124 P.3d 168, and at the time *Branson* was decided there was no rule in the Northern District of Illinois barring citation to opinions published only on Westlaw or Lexis, *KingVision Pay Per View v. Boom Town Saloon*, 98 F. Supp. 2d 958, 959 n. 1 (N.D. Ill. 2000). Such decisions, however, are entitled to whatever weight the persuasive force of their reasoning warrants, *see e.g. Hi-Tech Motors v. Bombardier Motor Corp.*, 2005 MT 187, ¶ 40, 328 Mont. 66, 117 P.3d 159, and DEQ overstates *Branson*'s relevance to the issue at hand. For one thing, the service dog's ability to traverse the workplace floors was not even an issue in that case. Moreover, while the *Branson* court assigned to the employee "responsibility for the behavior and control of her service dog," *Branson*, 1999 WL 1186420 at *14, 1999 U.S. Dist. LEXIS 19392 at *36, it appears from the context that the court was referring to the manner in which the service dog conducted itself toward staff, patients, and visitors. The court certainly did not hold that an employer need not modify a floor surface so that a disabled employee can use her service animal effectively in the workplace.

¶54 Turning to DEQ's arguments under 28 C.F.R. § 36.302(c), McDonald is correct that § 36.302(c) is not directly on point, since it applies to public accommodations (e.g., hotels, restaurants, theaters, auditoriums, shopping centers, hospitals, libraries, and parks, *see* 42 U.S.C. § 12181(7); 28 C.F.R. § 36.104) and DEQ is an employer, not a public accommodation, for purposes of this case. On the other hand, DEQ points out that the employment (Title I) regulations do not address service animals in substantial detail, but the public-accommodation (Title III) regulations do.[8] DEQ thus suggests that we should look to the Title III regulations for "guidance."

¶55 It is true that, given the cooperative spirit in which the ADA regulations were promulgated, we may consider Title III regulations as persuasive authority to the extent they are not inconsistent with Title I regulations and the MHRA. *Cf. Bartlett v. New York State Board of Law Examiners*, 226 F.3d 69, 82-83 (2d Cir. 2000); *Bragdon v. Abbott*, 524 U.S. 624, 642, 118 S. Ct. 2196, 2207 (1998). However, we conclude that the Title III regulations do not support DEQ's arguments. To the contrary, they support McDonald's position.

---

[8] Title I of the ADA prohibits discrimination in employment; Title II prohibits discrimination in access to public services and programs; Title III prohibits discrimination by public accommodations; Title IV concerns telecommunication services for hearing-impaired and speech-impaired persons; and Title V contains miscellaneous provisions, including a prohibition on retaliation, coercion, and intimidation. *See generally* Pub. L. No. 101-336, 104 Stat. 327 (1990). Congress divided among specific government agencies the authority to issue regulations implementing the ADA. *See Sutton v. United Air Lines*, 527 U.S. 471, 478-79, 119 S. Ct. 2139, 2144-45 (1999). Of relevance here, the Equal Employment Opportunity Commission has authority to issue regulations to carry out the provisions of Title I, *see* 42 U.S.C. § 12116; 29 C.F.R. § 1630.1(a), while the Attorney General has authority to issue regulations to carry out the provisions of Title III (except the provisions relating to transportation), *see* 42 U.S.C. § 12186; 28 C.F.R. § 36.101.

¶56    Section 36.302(c) states that a public accommodation generally must "modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability" but is not required "to supervise or care for a service animal." Based on this language, DEQ asserts that it had to allow Bess in the building and allow McDonald to take Bess on "bathroom breaks" but did not have to address the slipping issue, since that falls within the meaning of "caring for" a service animal. DEQ also compares § 36.302(c) with § 36.304 (requiring architectural barriers to be removed where such removal is readily achievable) and posits that § 36.302(c) is a "service animal provision" requiring changes merely to "polices, practices, or procedures" while § 36.304 is a "wheelchair provision" requiring "physical changes to a facility." Thus, in DEQ's view, the ADA rules "treat service animals differently than wheelchairs" and "require facility modifications for wheelchairs but not for service animals." DEQ would extend this purported lesser obligation to users of service animals into the employment context.

¶57    Contrary to DEQ's interpretations of the regulations, however, the fundamental obligations to users of service animals are no less than they are to users of wheelchairs. Although a service animal presents potential issues not encountered with inanimate assistive devices (e.g., the need to relieve itself), the general mandate is accessibility for *all* persons with disabilities, not just those using wheelchairs. *See generally* 28 C.F.R. §§ 36.101, 36.211, 36.301, 36.302, 36.303, and 36.304. Indeed, § 36.302(c) itself reflects Congress's intent that "the broadest feasible access" be provided to service animals and their users. 28 C.F.R. app. B § 36.302; *see also Johnson v. Gambrinus Company/Spoetzl Brewery*, 116 F.3d 1052, 1061 n. 6 (5th Cir. 1997).

29

¶58	Moreover, § 36.304 is not just a "wheelchair provision." It addresses a variety of barriers (e.g., "communication barriers," *see* 28 C.F.R. § 36.304(a), (b)(6), (b)(7)) and is aimed at "guaranteeing access" to *all* persons with disabilities, *see* 28 C.F.R. app. B § 36.304. Notably, one example of barrier removal is "[r]emoving high pile, low density carpeting," 28 C.F.R. § 36.304(b)(20), which is not unlike "removing" slippery tiling by putting down runners. Similarly, § 36.304(e) requires consideration of "safety features such as nonslip surfaces" on portable ramps. In other words, the barrier-removal rules cited by DEQ actually contemplate modifying a floor surface so that a person with a disability may use her assistive device effectively within the facility, which is what McDonald sought here. *See also* 28 C.F.R. app. B § 36.211 ("[I]t is not sufficient to provide features such as accessible routes, elevators, or ramps, if those features are not maintained in a manner that enables individuals with disabilities to use them.").

¶59	Lastly, DEQ's interpretation of "caring for" a service animal under § 36.302(c)(2) is without merit. According to the Attorney General's interpretive guidelines:

> [T]he rule does not require a public accommodation to supervise or care for any service animal. If a service animal must be separated from an individual with a disability . . . , it is the responsibility of the individual with the disability to arrange for the care and supervision of the animal during the period of separation.

28 C.F.R. app. B § 36.302. This explanation suggests that "supervising or caring for" a service animal under § 36.302(c)(2) means looking after the service animal in the owner's absence. For example, McDonald points out that "you cannot ask the ticket-taker to watch your dog for you while you go in and watch the movie."

30

¶60    For these reasons, we reject DEQ's arguments that employers are not required to modify a floor surface so that an otherwise qualified employee with a disability can use her service animal effectively in the workplace.

### C. Functionality of the Assistive Device

¶61    DEQ's final argument related to "scope" is that an employer is not required to accommodate the user of a poorly performing assistive device.  DEQ contends that it had no duty to provide floor coverings because Bess did not meet the "threshold of capability" (a standard proffered by DEQ).  DEQ asserts that Bess was "professionally trained to work on all types of surfaces and was not performing as trained."  Thus, DEQ analogizes Bess to "a poorly performing wheelchair" and argues that just as an employer should not be required "to make changes to the workplace to accommodate a wheelchair that was not functional," an employer should not be required "to provide runners or carpets for a trained service dog to walk on."

¶62    DEQ, however, cites no authority for its "threshold of capability" standard, and we note that the regulations defining "service animal" do not impose any such standard. They simply require that the animal be "trained" to provide assistance to its user, which Bess indisputably was.  *See* Admin. R. M. 37.90.449(6) ("A service animal is an animal trained to undertake particular tasks on behalf of a recipient that the recipient cannot perform and that are necessary to meet the recipient's needs for accessibility, independence, health, or safety."); 28 C.F.R. § 36.104 ("*Service animal* means any guide dog, signal dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability . . . .").

31

¶63 This is not to say that DEQ's concerns about Bess's functionality are immaterial. Rather, DEQ's arguments in this regard are simply misplaced here, since the functional capability of McDonald's assistive device relates to the reasonableness of the necessary accommodation, not whether DEQ had a duty to provide one in the first place. In other words, although Bess may have "performed poorly" on DEQ's tile floors (as DEQ contends), this did not relieve DEQ of its duty to make reasonable accommodations to McDonald's physical and mental disabilities. *See e.g.* Admin. R. M. 24.9.606(3)(a) (stating that "reasonable accommodation" may include "making existing facilities used by employees readily accessible to and usable by individuals with physical or mental disabilities"). The question is whether the accommodation she needed in order to use Bess in the workplace was reasonable, i.e., would not have "impose[d] an undue hardship upon the employer" or "endanger[ed] the health or safety of any person." Admin. R. M. 24.9.606(4), (6).

## D. Summary

¶64 In sum, we reject the proposition that DEQ fully satisfied its duty to McDonald by allowing her to bring Bess to work. Obviously, if a disabled employee's assistive device is not usable in the workplace, then allowing her to bring the assistive device to work is pointless. Further accommodations may be necessary. Indeed, as just noted, reasonable accommodation may include "making existing facilities used by employees readily accessible to and usable by individuals with physical or mental disabilities." Admin. R. M. 24.9.606(3)(a); *accord* 42 U.S.C. § 12111(9)(A); 29 C.F.R. § 1630.2(o)(2)(i). Thus, the duty to make reasonable accommodations does not end with

allowing the assistive device through the front door. It also requires the employer to address any barriers to the employee's ability to actually *use* that device effectively in the workplace. We conclude that this includes modifying a floor surface (if such an accommodation is otherwise reasonable).

**CONCLUSION**

¶65 McDonald was an otherwise qualified employee who needed and was entitled to a reasonable accommodation so that she could use her service animal effectively in the workplace. Her requested accommodation of nonskid floor coverings in the ground-floor hallways and the areas outside the first- and second-floor elevator doors was not beyond the scope of DEQ's duty under the MHRA. The District Court erred in holding to the contrary; and for this reason, we reverse the District Court's Memorandum and Order on DEQ's Petition for Judicial Review of the Decision of the Human Rights Commission.

¶66 We remand this case to the District Court with instructions to analyze, in the first instance and under the applicable standards of review (*see* ¶ 38, *supra*), the remaining issues raised by DEQ and McDonald within the context of DEQ's petition for judicial review. Those issues include whether McDonald's requested accommodation was "reasonable" as defined in Admin. R. M. 24.9.606(4)-(8); whether the hearing examiner's factual determinations regarding Bess's functionality were clearly erroneous; whether DEQ engaged in the mandatory "interactive process"[9] with McDonald in order to identify and implement appropriate reasonable accommodations so that she could use her service

___

[9] *See Barnett v. U.S. Air*, 228 F.3d 1105, 1111-14 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391, 122 S. Ct. 1516 (2002); 29 C.F.R. § 1630.2(o)(3), app. § 1630.9.

33

animal effectively in the workplace; whether the delay on DEQ's part amounted to a constructive denial of a reasonable accommodation; and whether the hearing examiner's award of damages is clearly erroneous.

¶67 Reversed and remanded for further proceedings consistent with this Opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ MIKE McGRATH
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ BRIAN MORRIS

Justice Patricia O. Cotter, concurring in part and dissenting in part.

¶68 I concur in the Court's decision on Issues 1 and 2. I respectfully dissent, however, from the Court's decision to remand this case for further proceedings in the District Court. The substantial evidentiary record in this case establishes that DEQ discriminated against McDonald in violation of the MHRA and that McDonald suffered damages as a result. She is entitled to prompt relief. Delaying her award of damages (which includes the cost of a replacement service dog) at this point only adds insult to injury and compounds the State of Montana's failure to provide a reasonable accommodation to one of its own employees.

¶69 The District Court and this Court apply the exact same standards of review to the hearing examiner's decision. Opinion, ¶ 38. Applying those standards and the relevant legal principles, I would conclude that McDonald's requested accommodation was reasonable, that DEQ's delay in providing an accommodation amounted to an adverse employment action, and that the hearing examiner's award of damages is not clearly erroneous.

**1. Was McDonald's requested accommodation reasonable?**

¶70 It is unlawful for an employer not to make "reasonable" accommodations to the known physical or mental limitations of an otherwise qualified employee with a disability. Sections 49-2-101(19)(b), -303(1)(a), MCA; Admin. R. M. 24.9.606(1)(a); 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a). Under Montana law, "[a]n accommodation to a person with a physical or mental disability for the purpose of enabling the person to perform the essential functions of an employment position is reasonable unless it would impose an undue hardship upon the employer" or "would endanger the health or safety of any person." Admin. R. M. 24.9.606(4), (6). The employer has the burden to show that the accommodation would impose an undue hardship upon the employer or endanger the health or safety of any person.[1] *See* Admin. R. M. 24.9.606(1)(a), (4), (6).

---

[1] This scheme differs from the ADA in one respect. Under the ADA, the employee must make an initial showing that the accommodation "seems reasonable on its face, *i.e.*, ordinarily or in the run of cases," or that "special circumstances warrant a finding that . . . the requested 'accommodation' is 'reasonable' on the particular facts." *See U.S. Airways v. Barnett*, 535 U.S. 391, 401, 405, 122 S. Ct. 1516, 1523, 1525 (2002); *Giebeler v. M & B Associates*, 343 F.3d

¶71    I first address undue hardship.  For purposes of determining whether an accommodation is reasonable, "undue hardship" means "an action requiring significant difficulty or extraordinary cost" when considered in light of the following factors:

- The nature and expense of the accommodation needed.

- The overall financial resources of the facility or facilities involved in the provision of the accommodation, the number of persons employed at the facility, the effect on expenses and resources of the facility, and other impacts of the accommodation on the operation of the facility.

- The overall financial resources of the business, the overall size of the business of the employer with respect to the number of employees, and the number and type and location of the facilities of the employer.

- The type of operation or operations of the employer, including composition, structure, and functions of the work force of the employer, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the employer.

Admin. R. M. 24.9.606(5)(a)-(d).  Applying these factors, the hearing examiner found that there was "no significant difficulty or extraordinary cost" associated with placing runners in the hallways.  He noted that the cost of supplying runners ($1,500 to $2,000 according to Smith's research, and $7,500 to $8,000 according to Olson's research) was "relatively minimal . . . compared to the overall financial condition of DEQ."

¶72    DEQ does not deny that it had a large surplus in its proprietary fund at the time McDonald requested her accommodation and that it could have afforded the runners or carpeting requested by McDonald.  Indeed, DEQ admitted at oral argument:  "The money was there.  If we thought it was the right thing -- if we needed to do it, we could do it."

---

1143, 1156 (9th Cir. 2003).  The employer then must demonstrate undue hardship.  *See Barnett*, 535 U.S. at 402, 122 S. Ct. at 1523.

36

Instead, DEQ reiterates its views that she did not need the accommodation and that Bess was performing poorly. DEQ also contends that other "more practical" measures were available and that the cost of runners or carpeting was out of proportion to their benefits.

¶73    With respect to DEQ's first point, the Court rejects the argument that McDonald did not need her requested accommodation. *See* Opinion, ¶¶ 42-48. As for DEQ's second point, DEQ utterly fails to establish that, given Bess's capabilities, installing runners or carpets would entail significant difficulty or extraordinary cost on DEQ's part.

¶74    Next, regarding DEQ's assertion about other measures, it is true that an employer has discretion in deciding which *effective* accommodation to provide:

> If more than one [potential accommodation] will enable the individual to perform the essential functions or if the individual would prefer to provide his or her own accommodation, the preference of the individual with a disability should be given primary consideration. However, the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.

29 C.F.R. app. § 1630.9. Here, however, neither of DEQ's proposed alternative measures can be considered an "effective" potential accommodation. One proposal was to hold meetings in Room 35; yet, as DEQ concedes, this was a "partial solution" at best. The other proposal was dog booties; however, DEQ merely speculates that this "may have been a solution." The hearing examiner, in contrast, determined that booties were *not* a viable solution, and DEQ has not shown this determination to be clearly erroneous.

¶75    Lastly, DEQ claims that the cost of runners or carpeting was "excessive" because they would provide "little or no job-related benefit to McDonald." DEQ's opinion about the benefits to McDonald, however, is based largely on conjecture and assumptions about

how long she will need the accommodation. DEQ ignores the benefits to McDonald in the present—for example, the ability to perform her job duties without the encumbrances caused by her disabilities and, similarly, the ability to enjoy the same level of benefits, privileges, and opportunities of employment as are available to similarly situated employees without disabilities. Moreover, DEQ offers no analysis related to its financial resources or any of the other factors listed in Admin. R. M. 24.9.606(5). The examiner, however, weighed the evidence related to DEQ's financial resources, the costs of runners and carpeting, and the benefits of the accommodation to McDonald and decided that placing runners in the hallways did not require significant difficulty or extraordinary cost. As McDonald correctly points out, it is not this Court's role to reweigh the evidence. *See* § 2-4-704, MCA.

¶76 Turning then to health or safety risks, DEQ asserts that mats and runners pose a "significant maintenance challenge" because "they must be moved daily to sweep the floors." That runners are a "challenge" or inconvenience for maintenance staff, however, does not render them a health or safety hazard. Alternatively, DEQ offers a brief argument that runners would have created a "trip hazard." DEQ bases this argument on testimony by two of its witnesses that runners and mats sometimes curl at the corners, become "rumpled," or get "wrinkles" in them. These witnesses' testimony, however, appears to be based largely on anecdotal evidence, and it is clear that the hearing examiner did not attribute substantial weight to it. Moreover, DEQ's argument rings hollow given that not once during the 17 months when McDonald was requesting runners or carpeting did DEQ tell her that runners were not a viable option due to safety issues.

38

¶77 In this regard, when an employer defends an adverse employment action on the ground that an accommodation would endanger health or safety, "the employer's failure to independently assess whether the accommodation would create a reasonable probability of substantial harm will create a disputable presumption that the employer's justification is a pretext for discrimination on the basis of disability." Admin. R. M. 24.9.606(7). "Independent assessment of the risk of substantial harm" is "evaluation by the employer of the probability and severity of potential injury in the circumstances." Admin. R. M. 24.9.606(8). Here, DEQ did not conduct an evaluation of the probability and severity of potential injury posed by runners or, for that matter, carpeting.

¶78 For these reasons, I would conclude that DEQ's arguments regarding health and safety risks and the burden on DEQ to provide floor coverings are without merit. McDonald's requested accommodation was reasonable. I next address whether DEQ's delay in providing an accommodation constituted an adverse employment action.

### 2. Did McDonald suffer an adverse employment action?

¶79 One of the elements of a disability-discrimination claim is that the employee suffered an adverse employment action because of her disability. *See Heaser v. Toro Co.*, 247 F.3d 826, 830 (8th Cir. 2001); *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006); § 49-2-303(1)(a), MCA. Adverse employment action includes the failure to make reasonable accommodations to an otherwise qualified employee who has a physical or mental disability. *Turner*, 440 F.3d at 611 n. 4; § 49-2-101(19)(b), MCA. An employer's delay in providing a reasonable accommodation can amount to a failure to make reasonable accommodations (i.e., a "constructive denial") and, thus, an adverse

employment action. *See Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1262 (10th Cir. 2001); *Krocka v. Riegler*, 958 F. Supp. 1333, 1342 (N.D. Ill. 1997); *James v. Frank*, 772 F. Supp. 984, 992 (S.D. Ohio 1991); *cf. Groome Resources v. Parish of Jefferson*, 234 F.3d 192, 199-200 (5th Cir. 2000). In evaluating whether the delay in providing a reasonable accommodation amounted to an adverse employment action, courts have considered the length of the delay, the reasons for the delay, whether the employer offered any alternative accommodations while evaluating a particular request, and whether the employer acted in good faith. *Selenke*, 248 F.3d at 1262-63; *but cf. Peebles v. Potter*, 354 F.3d 761, 766-67 (8th Cir. 2004) ("[A] claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive."); *accord Higgins v. New Balance Athletic Shoe*, 194 F.3d 252, 264 (1st Cir. 1999).

¶80   In this regard, employers are required to engage in an "interactive process" with disabled employees to identify and implement appropriate reasonable accommodations. *Barnett v. U.S. Air*, 228 F.3d 1105, 1111-14 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391, 122 S. Ct. 1516 (2002); 29 C.F.R. § 1630.2(o)(3), app. § 1630.9. The interactive process, which is triggered by the employee's request for an accommodation or the employer's recognition of the need for one, requires good-faith exploration of possible accommodations. *Barnett*, 228 F.3d at 1112, 1114. The employer should meet with the employee, request information about the condition and what limitations the employee has, ask the employee what she specifically wants, show some sign of having considered her request, and offer and discuss available alternatives

when the request is too burdensome. *Barnett*, 228 F.3d at 1115. Both sides must communicate directly and exchange essential information, and neither side should delay or obstruct the process. *Barnett*, 228 F.3d at 1114-15. Since the duty to accommodate is a continuing duty which is not exhausted by one effort, the employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed. *Humphrey v. Memorial Hospitals*, 239 F.3d 1128, 1138 (9th Cir. 2001).

¶81    In the present case, McDonald verbally requested an accommodation in March 2003, put that request in writing in September 2003, and reiterated it numerous times over the ensuing 11 months. Yet, by the time she left her position with DEQ in August 2004, DEQ still had not made a decision about providing the accommodation. As a matter of fact, when McDonald told Livers that she would not stay with DEQ unless the floor problem was resolved, Livers responded that he could not guarantee anything.

¶82    The hearing examiner stated that DEQ provided "no rational basis" for this 1½-year delay and that DEQ's failure to provide runners or an alternative reasonable accommodation was "inexplicabl[e] and unreasonabl[e]." Furthermore, the examiner found that DEQ did not engage in any discussion with McDonald about any course of accommodation except the placement of runners (what McDonald wanted) and holding meetings in Room 35 (which was not a viable solution). Regarding the three small mats provided in November 2003, the examiner noted that McDonald informed DEQ the mats were inadequate and asked that her requested accommodation be implemented, but to no

41

avail. The examiner concluded that DEQ's conduct was the result of "stereotypical institutional inertia" and held that "[t]he inordinate delay in providing and the ultimate failure to provide the accommodation that McDonald requested was a violation of the law."

¶83 DEQ challenges the examiner's decision on essentially two grounds. First, DEQ argues that the absence of runners or carpeting in the hallways did not affect McDonald's ability to perform the essential functions of her job and, thus, that DEQ's failure to provide them did not constitute an adverse employment action. This argument is totally without merit. The absence of nonskid floor coverings did affect McDonald's ability to perform her job duties and to enjoy benefits, privileges, and opportunities of employment on an equal basis as similarly situated employees. Opinion, ¶¶ 47-48.

¶84 Second, DEQ argues that it worked diligently to obtain responses from General Services regarding the provision of runners or carpeting in the hallways but that General Services "typically has a long timeframe for response to agency calls for building modifications." DEQ also contends that it engaged with McDonald in the interactive process but that McDonald's requests for floor coverings "changed over time." DEQ implies that these changes caused some of the delay in providing her an accommodation. In short, DEQ argues that it attempted in good faith to accommodate McDonald, but its efforts were stymied by General Services and McDonald herself. This argument too is without merit.

¶85 For one thing, McDonald's requests were not continually changing. The record clearly establishes that she asked for a nonskid surface in the ground-floor hallways in

March 2003 and maintained that request through the last day of her employment with DEQ in August 2004. Her specific suggestion may have varied between runners, mats, and carpeting, but the basic request was always the same: a nonskid floor covering to prevent Bess from slipping. Furthermore, DEQ is patently incorrect in its assertion that McDonald "accepted" the three small mats provided in November 2003 and tacitly withdrew her request for floor coverings along the entire length of the hallways. The mats were woefully inadequate, given that large areas of the tile floors remained uncovered, and McDonald conveyed this fact to Danzer, Cameron, and later Forgey. She never waivered in her request for nonskid floor coverings over *all* portions of the tile floors that she regularly traveled. The only substantive change occurred in March 2004 when she expanded her request to include the areas outside the first- and second-floor elevator doors. But this expansion does not excuse DEQ's delay (12 months at that point) in providing nonskid floor coverings in the ground-floor hallways.

¶86    Equally unavailing is DEQ's attempt to shift blame for its inaction to another state agency. Irrespective of the reasons for General Services' lack of prompt action, McDonald's immediate employer was DEQ. As her immediate employer, DEQ was required to provide, in a timely manner, either the reasonable accommodation which she repeatedly requested and which was well within DEQ's actual and financial ability to provide, or an effective alternative accommodation. DEQ did neither; and the notion that DEQ's delay can be excused by a sister agency's failure to treat the matter with "appropriate urgency" (Opinion, ¶ 20) is untenable. A disabled employee who is entitled

43

to a reasonable accommodation must not be held hostage to the sort of "stereotypical institutional inertia" the hearing examiner found in this case.

¶87   Finally, the record reflects that DEQ did not properly fulfill its obligation to engage in the interactive process with McDonald. From the outset, DEQ took no affirmative steps to identify and provide practical alternative accommodations for McDonald while waiting to hear back from General Services. Even when DEQ was made aware that the three small mats provided by General Services were ineffective, DEQ still did not attempt to identify and provide an effective alternative. Likewise, after learning that General Services would not pay for runners or carpeting, DEQ took no affirmative steps to provide them itself, even though one of its own employees had determined that the cost of runners for the ground-floor hallways was roughly $1,500 to $2,000, which DEQ easily could have afforded. But perhaps most tellingly, the record reflects that when McDonald left her position with DEQ, DEQ had not decided whether it would provide her an accommodation at all. DEQ explains on appeal that it did not believe it had a legal duty to do so and that its efforts to assist McDonald were entirely "voluntary." Yet if, as DEQ says, it did not believe it was legally required to accommodate McDonald, then it is doubtful that DEQ actually engaged in a genuine, good-faith interactive process with the goal of identifying and providing her a reasonable accommodation.

¶88   For these reasons, the hearing examiner correctly determined that the 17-month delay in providing McDonald's requested accommodation, to which she was entitled, was inordinate. I agree with the examiner that DEQ's failure to provide the accommodation

or a practical alternative was inexplicable and unreasonable. The delay amounted to a constructive denial of McDonald's request and, thus, an adverse employment action in violation of DEQ's obligation to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified employee. Sections 49-2-101(19)(b), -303(1)(a), MCA; Admin. R. M. 24.9.606(1)(a).

### 3. Is the hearing examiner's award of damages clearly erroneous?

¶89    Upon finding that a party has engaged in unlawful discrimination, the hearing examiner may "require any reasonable measure to correct the discriminatory practice and to rectify any harm, pecuniary or otherwise, to the person discriminated against." Section 49-2-506(1)(b), MCA. Here, the examiner awarded McDonald $10,000.00 for emotional distress, $18,000.00 for a replacement service animal, $1,536.00 for travel expenses to procure the replacement service animal, and $333.84 for veterinary bills. DEQ disputes the awards for emotional distress and replacing Bess. I address these in turn.

### Emotional Distress

¶90    As a preliminary matter, DEQ asserts that any emotional distress McDonald may have experienced did not rise to the level of "actionable" emotional distress. This case, however, is not a tort action; and we have previously held that the tort standard for proof of independent actions for emotional distress does not apply to civil rights cases brought pursuant to the MHRA. *See Vortex Fishing Systems v. Foss*, 2001 MT 312, ¶¶ 31-34, 308 Mont. 8, 38 P.3d 836. Emotional distress damages fall within the meaning of "any reasonable measure . . . to rectify any harm" in § 49-2-506(1)(b), MCA. *Vainio v. Brookshire*, 258 Mont. 273, 280-81, 852 P.2d 596, 601 (1993). Compensatory damages

may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances. *Vortex Fishing*, ¶ 33; *accord Benjamin v. Anderson*, 2005 MT 123, ¶ 70, 327 Mont. 173, 112 P.3d 1039. The severity of the harm governs the *amount*, not the *availability*, of recovery. *Vortex Fishing*, ¶ 33. The amount of damages to be awarded rests in the sound discretion of the fact-finder, but it must be reasonable and supported by substantial evidence. *See* § 49-2-506(1)(b), MCA; *Beaver v. Dept. of Natural Resources and Conservation*, 2003 MT 287, ¶ 85, 318 Mont. 35, 78 P.3d 857; *Kiely Const. v. City of Red Lodge*, 2002 MT 241, ¶ 102, 312 Mont. 52, 57 P.3d 836.

¶91 DEQ contends that the record does not support "any" damages for emotional distress in this case. In making this award, however, the hearing examiner observed that McDonald "was subjected to the distress of having to endure one and one half years of DEQ's failure to accommodate despite repeated requests"—i.e., DEQ's "stereotypical institutional inertia"—and that she "has also experienced some loss of social interaction due to the loss of the service animal." The record supports both points. First, McDonald presented evidence that she in fact became frustrated and upset with DEQ's ongoing failure to provide the reasonable accommodation she needed in order to use her service dog at work. Indeed, one of DEQ's own witnesses testified to this fact, and it certainly can be "inferred from the circumstances." *Vortex Fishing*, ¶ 33. Moreover, McDonald also presented evidence that she was very dependent on Bess, that Bess's services were profoundly important to her, and that the loss of those services caused her distress. Without Bess, McDonald had more difficulty completing her work, she would lose hours of time in dissociative episodes, her mobility decreased, she suffered more panic attacks,

she became more fearful of leaving the house, she was substantially less social, and her depression worsened. McDonald testified to these facts, as did her psychologist.

¶92 DEQ claims that McDonald's testimony was "vague and entitled to little weight." The hearing examiner, however, clearly disagreed, and it is not the reviewing court's job to second-guess his assessment of McDonald's credibility. Having heard the testimony and observed the witnesses, the examiner was in the best position to determine their credibility and the weight to be given to their testimony, and his determinations in this regard are entitled to great deference. *Benjamin*, ¶ 37; § 2-4-704(2), MCA. DEQ also claims that McDonald was "very understanding" about DEQ's delay in providing her requested accommodation. The pertinent question, however, is not whether there is evidence supporting findings different from those made by the examiner; it is whether substantial evidence supports the findings actually made. *Benjamin*, ¶ 55. Here, the examiner's finding that McDonald suffered distress as a result of DEQ's "stereotypical institutional inertia" and the loss of Bess is supported by substantial evidence. DEQ has not shown error in the award of $10,000 for emotional distress damages.

**Replacing Bess**

¶93 The examiner held that McDonald was entitled to compensation for "the loss of her property due to the failure of DEQ to provide the accommodation." He found that Bess, "had she not been injured, could have continued to serve McDonald," but Bess was "no longer useful as a service animal due to the falls the dog incurred at the Metcalf Building." The examiner further observed that there was "no evidence to show that McDonald can replace the service animal for anything less than $18,000.00."

47

¶94 DEQ argues that no damages should be awarded for the loss of Bess because her injuries occurred "on floor conditions that McDonald had approved." DEQ is referring to the three small mats provided in November 2003 and arguing that because McDonald said she would try the mats, she effectively "approved" the slippery conditions of the remaining uncovered floors where Bess slipped and fell in January and March 2004. This argument is without merit. As noted, McDonald told Danzer and Cameron that the mats were inadequate. Although she agreed to try them, she never withdrew her request for nonskid floor coverings over all portions of the tile floors that she regularly traveled.

¶95 Alternatively, DEQ argues that the award of $18,000 was clearly erroneous. The CARES representative testified that the fair market value of a service dog with Bess's training is "$18,000 and up" but the market value of a dog who can no longer perform services as a service animal is essentially nothing. DEQ, however, posits that CARES would charge McDonald only $500 for a new service dog and that DEQ, therefore, should not be liable for the full $18,000 market value. Moreover, DEQ contends that Bess "was nearly ¾ finished with her service life" when she had to be retired and that McDonald, therefore, is entitled to only ¼ of the $500 replacement fee, i.e., $125.

¶96 This argument founders on several factors. For one thing, DEQ ignores the fact that CARES cannot guarantee it will be able to provide McDonald with a service dog to match her specific physical and mental needs. But regardless, McDonald does not intend to procure a replacement dog through CARES. The process requires her to travel to the training facility and stay there for about seven days of training, working with the new dog, and getting the dog adjusted to being her service dog. For this reason, and because

CARES is located in Kansas, McDonald intends to work with a provider located closer to Helena—namely, Great Plains Assistance Dogs Foundation in North Dakota. Notably, the award of $1,536 for travel expenses (which DEQ does not challenge) is based on the costs McDonald would incur traveling to North Dakota.

¶97 Finally, DEQ overlooks the purpose of the remedies provided by the MHRA, which is to return employees who are victims of discrimination to the position they would have occupied without the discrimination. *Vortex Fishing*, ¶ 27. Here, DEQ produced no evidence that Bess was worth anything less than $18,000 when she had to be retired or that a replacement could be procured for anything less than that amount. As for DEQ's contention that CARES (or some other organization) might mitigate McDonald's loss, this Court has held that when a collateral source mitigates an employee's loss, the *employee* should receive the benefit. *Vortex Fishing*, ¶¶ 27-28. In *Vortex Fishing*, the hearing examiner awarded the employee back pay, although the employee had also received unemployment compensation benefits for the same time period. We affirmed, stating that "between the employer, whose actions caused the discharge, and the employee, who most likely suffered other noncompensable losses, the burden should be placed on the employer." *Vortex Fishing*, ¶ 28. Likewise here, even assuming, for the sake of argument, that McDonald will receive financial assistance in obtaining a replacement service dog for less than its fair market value, that benefit should accrue to McDonald as the employee who was subjected to illegal discrimination, not DEQ which perpetrated the illegal discriminatory act.

49

¶98 In conclusion, the hearing examiner had authority under § 49-2-506(1)(b), MCA, to impose any reasonable measure "to rectify any harm" to McDonald. Given the "broad remedial nature" of this provision, *Vortex Fishing*, ¶ 34, the examiner determined that anything less than $18,000 would not "rectify" McDonald's loss of Bess. McDonald presented evidence that the value of a service dog with Bess's training is "$18,000 and up." DEQ's claim that she can obtain a service dog for less than its fair market value is based largely on supposition. Moreover, it is inapposite, since any such benefit belongs to McDonald, not DEQ. As the party seeking to overturn the examiner's award of $18,000 to replace Bess, DEQ bears the burden of demonstrating the examiner's findings are clearly erroneous. DEQ has not met this burden.

## CONCLUSION

¶99 DEQ failed to show that McDonald's requested accommodation was not reasonable under Admin. R. M. 24.9.606(4) and (6). As a matter of fact, DEQ concedes that it easily could have afforded to install runners or carpeting, and there is no evidence that DEQ conducted the independent assessment required by Admin. R. M. 24.9.606(7) and (8). Moreover, while Bess had difficulty walking on DEQ's slippery tile floors, DEQ does not deny that she was fully functional on runners and carpeting—which, again, were well within DEQ's financial ability to provide.

¶100 Yet, DEQ provided McDonald with no accommodations at all, save for the three mats General Services put down in November 2003, which were patently inadequate. Rather, DEQ dragged its heels for 17 months under the apparent belief it had no legal obligation to honor McDonald's requests. As the Court holds, DEQ was mistaken in this

50

regard and had a duty to address any barriers to her ability to use Bess effectively in the workplace. Opinion, ¶ 64. But I would go further than has the Court and, based on the analysis above, would hold that McDonald's requested accommodation of runners or carpeting was reasonable and DEQ's failure to provide that or an effective alternative accommodation constituted an adverse employment action. Finally, I would hold that DEQ has not shown the hearing examiner's award of damages to be in error. On this basis, I would reverse the District Court's decision and remand with instructions to reinstate the Final Agency Decision.

¶101   I concur and dissent.

/S/ PATRICIA COTTER