DA 10-0537

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 209

DANA HEADAPOHL and LAWRENCE MARTIN,

      Petitioners and Appellees,

  v.

MISSOULA CITY-COUNTY BOARD OF HEALTH
and MISSOULA CITY-COUNTY HEALTH DEPARTMENT,

      Respondents and Appellants.

APPEAL FROM:    District Court of the Fourth Judicial District,
                 In and For the County of Missoula, Cause No. DV 09-1207
                 Honorable Douglas G. Harkin, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Martha E. McClain, Deputy County Attorney, Missoula County, Missoula,
            Montana

      For Appellees:

            John K. Tabaracci, Robert Erickson; Sullivan, Tabaracci & Rhoades, P.C.,
            Missoula, Montana

                        Submitted on Briefs:  May 11, 2011

                               Decided:  August 30, 2011

Filed:

_____
                   Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1    The Missoula City-County Health Board (Board) and Missoula City-County Health Department (Department) appeal the order and judgment of the Fourth Judicial District Court, Missoula County, that reversed the Board's determination that Dana Headapohl and Lawrence Martin (collectively Headapohl) had violated the Missoula City-County Health Code (Health Code) by placing two buildings in the floodplain without a permit and by installing an incinerating toilet.  We reverse and remand.

¶2    The parties raise the following issues on appeal:

¶3    *Did Headapohl's addition of two detached outbuildings to the property constitute increased use of the septic system that violated the Health Code?*

¶4    *Did the District Court incorrectly rely on information outside the administrative record in reviewing the Board's decision?*

¶5    *Does an incinerating toilet constitute a "wastewater treatment and disposal system" under the Health Code?*

FACTUAL AND PROCEDURAL BACKGROUND

¶6    Headapohl lives on a 12-acre lot in the floodplain of the Bitterroot River near the confluence with the Clark Fork River.  The Department issued a septic permit in 1983 to Headapohl's predecessor in interest for a septic system that could service a three bedroom trailer house.  The Health Code sizes septic systems by the number of bedrooms the septic systems service.  The Health Code requires a septic system with 300 gallons of capacity for a 3-bedroom house.  The Health Code requires an additional 50 gallons of capacity for every

2

additional bedroom in a structure serviced by the septic system. Floodplain restrictions prohibit expansion of the septic system on the Headapohl property. Headapohl cannot build additional bedrooms consequently onto the residence without a permit or variance.

¶7 Headapohl purchased the property in 1993. Headapohl replaced the three bedroom trailer with a new 2358 square foot house. The Department approved Headapohl's plan to build the house pursuant to a septic permit that provided Headapohl with the same exemption as the one afforded her predecessor for the trailer house. The permit included a memorandum from a Department employee regarding the sewage system that stated, "[t]hree bedroom use is maximum potential for this lot."

¶8 Despite the admonition in the permit memorandum, Headapohl moved two buildings from a nearby farm to the floodplain property in 2007. Headapohl sited the buildings approximately 100 feet from the main residence. Headapohl did not obtain permits or inquire about the necessity of permits. Headapohl made no effort to contact the Department or any County entity. The Board claims that Headapohl's actions in moving the buildings and placing them on concrete pilings required permits from the Public Works/Building Inspector, the Floodplain Administrator, and the Department.

¶9 Headapohl remodeled the buildings' interiors and exteriors, installed wiring and heating systems, and built decks and pathways for the buildings. Headapohl did not directly connect the buildings to the water or septic system of the primary residence. Headapohl installed an incinerating toilet in one of the buildings. One building contains a single room

and the other building contains two rooms.  The finished buildings look and feel like houses.  The finished buildings are suitable for human occupancy.

¶10     Headapohl uses one of the buildings for yoga, meditation, and prayer.  The building contains a harp, drums, and a music system.  The other building contains 40 years of accumulated yarn, a large loom, and art supplies.  Headapohl uses this building for art projects.  Headapohl hosts three to five friends for art project activities in this building.  These social art activities previously had taken place in the main house.

¶11     The Department and Floodplain Administrator received inquiries from neighbors who wanted to build in the area.  The neighbors pointed to Headapohl's new buildings in the floodplain as the impetus for their request.  The Department had no previous knowledge of the two additional buildings on Headapohl's property.  The Department investigated and issued a Notice of Violation (NOV) to Headapohl on May 12, 2009.  The NOV informed Headapohl that the additional buildings violated the Health Code and would require removal.

¶12     Headapohl requested an informal administrative review of the NOV before the Department.  The Department held a hearing.  Headapohl disclosed the installation of the incinerating toilet.  Headapohl claimed that the buildings contained no beds and that Headapohl did not intend the buildings to serve as bedrooms.  The Board asserts that Headapohl admitted at this hearing that the buildings could be used by family and visitors as a place to sleep.  The minutes from the meeting indicate that Headapohl acknowledged that the buildings could be used as a place for visitors to "stay."  The Department issued an Amended NOV in light of this information.

4

¶13 The Amended NOV informed Headapohl that the two structures constituted "increased use" of the septic system in violation of the Health Code. The Amended NOV informed Headapohl that the structures did not have to be connected physically to the septic system to be "served" by the septic system. The Amended NOV explained that "[w]hen persons occupy a building or buildings served by a septic system each additional occupant adds sewage load resulting from black-water flows, kitchen flows, bathing flows, bathroom flows, and laundry flows." The Amended NOV required Headapohl to remove the buildings and the un-permitted incinerating toilet. Headapohl unplugged the incinerating toilet after learning that it violated the Health Code.

¶14 The Board held a hearing at Headapohl's request on August 20, 2009. The Department argued that Headapohl had increased use of the septic system by increasing the number of bedrooms beyond that allowed under Headapohl's 1983 permit. The Department argued that the Health Code defined bedroom as any room capable of use for sleeping, including unfinished basements. The Department routinely views any room that can be used for sleeping as a bedroom. The Health Code notes that "[a]ny space or room such as a den, study, storage area, or any area that can be easily converted to a bedroom shall be considered an additional bedroom."

¶15 The Department looks at potential use of rooms rather than intended uses because intended uses change with changes in ownership. The Department provided, for example, that it commonly includes bedrooms that are not enclosed or under the roof of the primary structure when it sizes cabins. The Department explained that a building with the septic

5

system can service detached buildings. The Department believed that Headapohl's addition of the three bedrooms in the two new buildings could increase the effluent flow to Headapohl's septic system. Headapohl confirmed that when her daughter visited, she could "sleep in the buildings or sleep on the lawn or sleep in a tent, that was up to her." Headapohl maintained, however, that she did not intend to have visitors sleep in the new buildings. The Department argued that even if Headapohl did not intend to allow others to sleep in the buildings, the buildings could be used as bedrooms for overnight guests by either Headapohl or Headapohl's successors in interest.

¶16 The Board affirmed the Department's Amended NOV by a 4-1 vote following the parties' presentations at the August 20, 2009, hearing. Headapohl petitioned for judicial review in the District Court on October 7, 2009. Headapohl argued that the Board incorrectly had applied the Health Code, acted arbitrarily and capriciously, and that the definition of "increased use" suffered unconstitutional vagueness on its face and as-applied to Headapohl. The Department responded on November 23, 2009.

¶17 The Board meanwhile amended the Health Code's definition of bedroom specifically to include detached buildings. The Board completed these amendments on October 15, 2009. Headapohl filed a notice with the court that the matter had been "fully briefed" and was "ripe for adjudication" on March 23, 2010. The court issued an order on June 3, 2010, that stated that the court did "not appear to have a complete record before it on appeal." The District Court ordered the Board to provide a copy of the Health Code as amended in 2009, a

6

copy of the 2007 Health Code, and "any discussion, comments or rationalizations" concerning the 2009 amendments.

¶18 The court issued its final decision on July 12, 2010. The court concluded that Headapohl had not violated the Health Code by adding the two buildings, that the contested provisions of the Health Code suffered unconstitutional vagueness as-applied to Headapohl, and that the incinerating toilet did not qualify as a wastewater treatment and disposal system under the Health Code.

## STANDARD OF REVIEW

¶19 We review district court orders that review an administrative decision in a contested case under the same standard applied by the district court. *Whitehall Wind, LLC v. Mont. Pub. Serv. Commn.,* 2010 MT 2, ¶ 15, 355 Mont. 15, 223 P.3d 907. We review to determine whether the administrative agency's findings of fact are clearly erroneous and whether the agency correctly has interpreted the law. *Id.* We review for correctness a district court's conclusions of law. *Plains Grains L.P. v. Bd. of Co. Commrs.,* 2010 MT 155, ¶ 21, 357 Mont. 61, 238 P.3d 332.

## DISCUSSION

¶20 *Did Headapohl's addition of two detached outbuildings to the property constitute increased use of the septic system that violated the Health Code?*

¶21 The 2007 Health Code contains a section entitled "Increased Use, Changes of Use And Enlargement of Structures" that prohibits a person from "operat[ing] an existing system

7

that has increased use." The 2007 Health Code defines "increased use" as "the enlargement or change in use of a structure served by a wastewater treatment and disposal system where the enlargement or change in use would potentially increase the effluent flow from the structure."

¶22 The definition additionally provides that increased use "includes but is not limited to" enlargement of a residence by adding one or more spaces that can be used as bedrooms. Increased use also includes increasing a room or building's total square footage in a way that could lead to increased use in the future. Both situations describe physical enlargements to the residence. As a result, the court concluded that the definition of "increased use" contemplated only physical enlargements or additions to Headapohl's residence itself. The court's interpretation fails to give effect to the part of the definition of "increased use" that includes "change in use" of a structure served by a wastewater treatment and disposal system that "would potentially increase the effluent flow from the structure."

¶23 The parties do not dispute that Headapohl did not physically enlarge the three-bedroom residence on the property. Headapohl placed the two buildings at least 100 feet from the three-bedroom residence. Headapohl's primary residence remains at a total 2358 square feet. The court concluded that a "plain reading" of the 2007 Health Code did not prohibit Headapohl's "freestanding buildings." The court's "plain reading" of the 2007 Health Code considers, however, only a partial reading of the definition of "increased use."

¶24 The court failed to consider the full definition of "increased use." Increased use encompasses "the enlargement *or change in use* of a structure." (Emphasis added.) The

8

definition of "increased use" plainly states that the concept "includes but is not limited to the enlargement of a residence." The District Court's order fails entirely to address whether Headapohl's "change in use" of the structure "would potentially increase the effluent flow from the structure."

¶25 Headapohl's modification of the two buildings from agricultural uses to domestic uses in which she engages in activities previously performed in the 2358 square foot residence raises the prospect of an increase in effluent flow. The Department argued to the District Court that the activities taking place in the two additional buildings likely would increase the number of people who would need "to go to the house in order to go to the bathroom, bathe, wash hands, prepare food, do laundry and clean."

¶26 The Department raises the issue that Headapohl has changed the use of her primary residence by adding two buildings to her property and using those buildings to provide space for storage and functions previously served by her primary residence. Headapohl uses the two buildings as shrines, for meditation and yoga, for storing 40 years of accumulated fiber art projects and supplies, and for knitting, weaving and music. The storage of materials and other activities previously may have taken place in the Headapohl residence. The Department argues that Headapohl's efforts to outsource her storage and hobby activities by adding the two outbuildings has increased the capacity of Headapohl or her successors in interest to use the property, to host guests and gatherings, and to take in additional occupants.

¶27 Headapohl has admitted that the social art gatherings in the craft building included three to five guests. Headapohl previously had hosted these activities in the primary

9

residence. Headapohl claims that she does not intend that guests sleep in the buildings, but has acknowledged that the restored, heated, and wired buildings could be used as a place where persons could sleep.

¶28 We remand to the District Court to review the administrative record under the complete definition of "increased use" as defined in the 2007 Health Code. This "increased use" could take the form of "enlargement" or "change in use" of a structure. The District Court should have the opportunity in the first instance to determine whether Headapohl's actions constitute an "increased use" under either part of the definition that potentially would increase effluent flow to her septic system. *McDonald v. Dept. of Envtl. Quality,* 2009 MT 209, ¶ 66, 351 Mont. 243, 214 P.3d 749. We need not address the court's constitutional determinations in light of our decision. *Weidow v. Uninsured Employers' Fund,* 2010 MT 292, ¶ 22, 359 Mont. 77, 246 P.3d 704.

¶29 *Did the District Court incorrectly rely on information outside the administrative record in reviewing the Board's decision?*

¶30 The Board held the Headapohl hearing on August 20, 2009. The Board followed and applied the version of the Health Code in effect at that time. The Board amended the Health Code on October 15, 2009. The 2009 amendments changed the definition of "bedroom" to include separate buildings that are not attached to the plumbed structure.

¶31 Headapohl appealed the Board's decision to the District Court on October 7, 2009. Headapohl argued in her January 28, 2010, brief that the Board had amended the definition of "bedroom" on October 15, 2009, because of the vagueness in its definition regarding

outbuildings. The District Court issued an order on June 3, 2010, that stated the court's belief that it did not have a complete record before it on appeal. The court ordered the Board to provide a copy of the current Health Code, a copy of the one in effect on the day of the Board's hearing, and "any discussion, comments or rationalizations" concerning the 2009 amendments to the Health Code. The Board complied without objection.

¶32 The Board argues that the District Court incorrectly relied on the requested documents. We note that the District Court relied on the additional documents only in its constitutional analysis. We have declined to address the constitutional issues in light of our decision to reverse the District Court's incomplete interpretation of "increased use." Whether the District Court incorrectly relied on the additional 2009 documents does not bear on our conclusion on that issue. The District Court may address the propriety of considering the additional 2009 amendment documents in its review of the administrative record on remand.

¶33 *Does an incinerating toilet constitute a "wastewater treatment and disposal system" under the Health Code?*

¶34 The Board appeals the District Court's conclusion that the incinerating toilet installed by Headapohl does not constitute a "wastewater treatment and disposal system." The Health Code defines "wastewater treatment and disposal system" as "any wastewater system . . . which receives human excreta, liquid waste, or both; treats the effluent; and disposes of the effluent through application into or onto the soil, or into any device, sealed vault, or holding tank." The toilet installed by Headapohl receives human excreta and liquid waste. The toilet

11

treats the effluent and liquid waste by incinerating the matter into water vapor and ash. The toilet collects the ash in a receptacle that must be emptied with use. We agree with the Board that the incinerating toilet meets the definition of "wastewater treatment and disposal system."

¶35 Headapohl first argues that the Health Code prohibits only subsurface systems. The Health Code provides, however, that a "wastewater treatment and disposal system" disposes of effluent "into or onto the soil, or into any device." Headapohl's incinerating toilet disposes of effluent into a device. The Health Code recognizes that wastewater treatment and disposal systems can be "conventional systems" or "alternative systems." The definition of "conventional system" requires that the system be "subsurface" and consist of "a septic tank and a drainfield." The definition of "alternative systems" broadly includes "wastewater treatment and disposal systems approved by the Department to be used in lieu of conventional systems." Alternative systems include systems used above the surface of the ground. Headapohl's incinerating toilet constitutes an "alternative" system that disposes of waste above the surface of the ground. We reject Headapohl's argument that the system must dispose of the effluent underground in order to fall within the ambit of the Health Code's prohibition.

¶36 Headapohl next argues that the Health Code allows waterless toilets. We agree that the Health Code allows a waterless toilet as an "alternative system" when the installer has obtained the requisite permit. Headapohl has not obtained a permit. Headapohl makes no plausible claim of having the incinerating toilet grandfathered under the 1983 permit.

12

¶37 Headapohl finally argues that she fully complied with the Amended NOV by unplugging the toilet before the August 20, 2009, hearing. Headapohl argues that the Board improperly affirmed the Amended NOV's declaration regarding the toilet in light of her compliance. We disagree with Headapohl's circular argument that a person can fall in and out of compliance with the Health Code simply by plugging and unplugging an incinerating toilet.

¶38 Headapohl petitioned the Board to review the Department's Amended NOV. Headapohl may have informed the Board at the August 20, 2009, hearing that the toilet had been unplugged, but Headapohl did not drop the challenge to the Department's Amended NOV that the toilet did not qualify as a "wastewater treatment and disposal system." The Board correctly concluded that Headapohl had installed a "wastewater treatment and disposal system" in violation of the Health Code. The Board correctly affirmed the Amended NOV even though Headapohl apparently had unplugged the toilet by the August 20, 2009, hearing.

CONCLUSION

¶39 We reverse the District Court's conclusion and judgment that Headapohl had not increased use of the septic system by adding the yoga studio and craft cottage to the floodplain property. The court considered only increased uses caused by physical enlargements to the residence. The court failed to consider increased use caused by a "change in use" of the structure that potentially would "increase effluent flow from the structure." We remand to the District Court to determine whether Headapohl's changes of use could result in increased effluent flow to the permitted three-bedroom septic system. We

13

further conclude that Headapohl's incinerating toilet requires a permit under the Health Code as a "wastewater treatment and disposal system."

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER

Justice James C. Nelson, dissenting.

¶40 I would affirm the District Court's decision in every respect. However, because this case is being remanded, and because the Court has not reached the constitutional issues, Opinion, ¶ 28, those vagueness issues can again be considered and disposed of on remand.

¶41 That said, I simply cannot agree with the Court's conclusion that Headapohl's incinerating toilet meets the definition of "wastewater treatment and disposal system." Opinion, ¶ 34. This determination is, at best, preposterous. The toilet is electric; it is not plumbed into the sewage disposal system, nor does it empty into the ground. Rather, the toilet disposes of solid and liquid human waste by electrical incineration. The end result of the toilet's operation is nothing but ash, which is disposed of (according to the toilet's instructions) by putting the ash into a garbage can. The Court's conclusion is akin to equating a restroom hand air-dryer with a dispenser of paper towels.

¶42 More to the point, that the administrative regulations at issue here can be interpreted to reach the result that the Court reaches in Issue 3 speaks volumes about vagueness. Penal

14

statutes—and, presumably, administrative regulations—must be written " 'with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' " *State v. Knudson*, 2007 MT 324, ¶ 18, 340 Mont. 167, 174 P.3d 469 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 1858 (1983)).  The administrative regulations at issue in this case fail on both counts.  I refuse to believe that any ordinary citizen would conclude that an electric, incinerating toilet violates the Missoula City-County Health Code because it is a "wastewater treatment and disposal system."  Indeed, upon being so advised, I expect that most ordinary citizens would consider themselves to be the butt of a bad joke.

¶43    The District Court got it right, and its decision should be affirmed.  I dissent from this Court's contrary holding.

/S/ JAMES C. NELSON